234 P.2d 339

STATE ex rel. SALAZAR v. HUMBLE OIL & REFINING CO. et al.

No. 5383.

Supreme Court of New Mexico.

July 25, 1951.

Seth & Montgomery, Santa Fe, Atwood, Malone & Campbell and Hervey, Dow & Hinkle, all of Roswell, for appellants.

Joseph L. Martinez, Atty. Gen., Philip H. Dunleavy, Asst. Atty. Gen., M. W. Hamilton, Santa Fe, for appellee.

COORS, Justice.

This suit for declaratory judgment was filed by the Commissioner of Revenue of the State of New Mexico against fifteen oil companies who are the largest producers and purchasers of oil and gas produced in New Mexico. It was a class action brought not only against the fifteen named defendants individually but as representatives of all persons similarly situated. The action is based upon actual controversies between plaintiff and defendants involving the correct interpretation of the provisions of Ch. 103 of the New Mexico Session Laws of 1937 as amended by Ch. 65 of the New Mexico Session Laws of 1949, Sec. 76–1301 to Sec. 76–1325, N.M.Stat.Ann.1941. Among the named defendants there are and they represent ·all types and classes of persons interested in any way in the production of oil and gas in New Mexico, including owners of leases, working interests, royalties, overriding royalties and any other type of royalty, operators, severers, producers, and also original or first purchasers who have no ownership.

Under the provisions of the statute, Ch. 103 of the 1937 Session Laws, the oil and natural gas industry had been required to pay monthly severance tax of two per cent of the value of all oil and gas severed and saved from the soil. Additional natural resource products, including copper, silver and other metals, were likewise required to pay a severance tax at different rates of their value. The 1949 Legislature amended this severance tax law in several particulars but principally by (a) raising the tax rate and (b) by granting to the "taxpayer" an exemption of $200,000.00 annually, to be deducted from the gross value of the natural products severed, before computing the tax, which amounted to an exemption up to $5,000.00 to each person ("the taxpayer") entitled thereto.

Considerable confusion arose after the passage of this amendment allowing an exemption as it might apply to the gas and oil industry. It was readily seen that innumerable difficulties, some possibly without a foreseeable solution, would arise in attempting to compute and allow the exemption to and assess the tax against every owner of any interest in oil or gas located any and every where in New Mexico and to make these computations and collect monthly as the law provided. There was wide divergence of opinion on the answer to the question of who was entitled to the exemption and as to the responsibility of the producers and first purchasers in administering the act and their liability in attempting to do so.

The Commissioner of Revenue, charged with the duty and responsibility of collect-

ing the tax, in order to clear up the serious questions involved, filed this suit. The complaint alleged that the fifteen named defendants were all interested in some manner in the production of oil or gas in New Mexico, or in the purchase thereof, or were owners of interests of some kind, royalty, working or otherwise, and that the named defendants as a whole represent all types and phases of ownership in the oil and gas industry. It is further alleged that there are other persons so numerous as to make it impracticable to specifically name them as parties defendants but that the named defendants are fairly representative of all parties in each class interested in the suit and it is filed as a class action to be binding not only on the defendants named but on all others having any interest or ownership in the oil or gas produced in the State; that actual controversies existed between the plaintiff and defendants and common questions of law and fact affect the rights of all classes of parties to the suit and that a common relief is applicable to all.

The complaint further states that by virtue of said Ch. 103 of the Session Laws of 1937, as amended by Ch. 65 of the Session Laws of 1949, a tax is imposed upon natural resource products severed from the soil in the State of New Mexico, which tax imposed upon oil and gas is two and one-half per cent. (2½%) of the value of same at time of severance; that by virtue of the amendment, Sec. 2 of Ch. 65 of the Session Laws of 1949, the taxpayer under said act is granted an exemption from taxation of $200,000.00 annually, which shall be deducted from the gross value before computing the tax. The complaint then sets forth the real issues in controversy in brief as follows:

1. That plaintiff contends the $200,000.-00 exemption provision found in Sec. 2 of Ch. 65 of the 1949 Session Laws is invalid and void by reason of being ambiguous, vague, indefinite and uncertain as to oil and gas, and impossible of application with reference thereto, and that the defendants assert the exemption provision is valid.

2. That plaintiff contends that if the exemption is valid the word "taxpayer" as used in the said act as amended has a special or technical meaning and refers only to the persons reporting and directly paying the tax to the State and that they are the only persons (the producers and first purchasers) entitled to the exemption; and, on the other hand, the defendants assert that every owner of any interest of any kind in the oil or gas when severed is a taxpayer within the act and is entitled to a $200,000.00 exemption.

3. That plaintiff asserts that in any event only one exemption is granted a taxpayer regardless of the number and kind of natural resource products he may

own at time of severance, while defendants claim a taxpayer is entitled to a separate exemption on each natural resource product severed.

4. Plaintiff asserts that Sec. 4 of Ch. 65 of the 1949 Session Laws purporting to establish a permanent fund into which severance taxes should be paid is invalid and void because no reference to the provisions of this section was made in the title to the act as required by Art. 4, Sec. 16, of our Constitution; the defendants assert the validity of such section. The plaintiff prays for a declaratory judgment determining the rights of all the parties in controversy.

The various defendants filed their answers wherein they admitted all material allegations in the complaint and admitted that actual controversies did exist between the parties and that the complaint correctly stated the existing controversies. The defendants prayed the court to render judgment declaring and determining the rights and obligations of all the parties in respect to the matters set forth in the pleading.

It is to be remembered that this suit was directed at and involved only the oil and gas industry and persons connected therewith in New Mexico. The named defendants were all connected or interested in some way as above mentioned in the production of oil or gas, and the unnamed defendants affected by virtue of the class action were only those connected with or interested in purchase or production of oil or gas. No miners or producers or severers of metals or other natural resource products were attempted to be brought in as defendants.

The Banner Mining Company, a producer of copper, silver and other metals, filed a motion to intervene and a complaint in intervention. This intervenor alleged it was engaged in mining and producing copper and other metals in Hidalgo County, New Mexico, and was subject to the said severance tax and entitled to the exemption mentioned; that no mining company engaged in mining metals was made a party to this action and therefore it was not adequately represented by the named defendants who were all in the oil and gas industry and that since intervenor might in some way be bound by a judgment entered in this class action, it was entitled to intervene; that the plaintiff did not allege in its complaint that there was any controversy existing as to any tax on natural resource products severed, excepting oil and gas, and did not claim there was any controversy between plaintiff and intervenor or plaintiff and producers of copper or other metals and that intervenor affirmatively alleged that there is no disagreement or controversy concerning the interpretation and application of the severance tax laws as to taxing of copper and

other metals. The intervenor further alleges that it, as well as other metal miners, is entitled to the $200,000.00 annual exemption on the gross value of the metals produced by each and that such exemption applied to the value of all metals mined and produced. No separate claim of exemption was made on each metal mined but one exemption covering all metals produced in each fiscal year.

The plaintiff and the intervenor entered into and filed a written stipulation consenting to the filing of the intervention and consenting that the court enter an order allowing the intervention and that all the allegations of the complaint in intervention be taken as true and confessed against the plaintiff and that the court take the said facts as admitted without presentation of evidence and that judgment be entered in accordance with such facts. The trial court entered an order thereafter finding "that the facts in said complaint in intervention be taken as true and confessed against the plaintiff and that they be taken as the facts in this case so far as they affect the controversy between the intervenor and the plaintiff."

The intervenor took no appeal from the final judgment rendered by the lower court and neither the defendant nor the plaintiff took any exception or made any objection to any ruling of the court with reference to taxes on metals severed or the tax exemptions allowed metal miners or producers. The intervenors were not parties either to the appeal taken by the defendants nor to the cross appeal taken by plaintiff. The intervenor is not before us on this appeal and the judgment of the lower court insofar as it declared and adjudged the rights and responsibilities between the plaintiff and the intervenor, a miner of copper and other metals, is final and not affected by this appeal.

The evidence in the case is undisputed. One witness testified briefly but the facts to be considered by the court were agreed upon between plaintiff and defendants and were set forth in a long written stipulation filed in court, accompanied by copies of many actual typical written instruments commonly used by the oil and gas people in the carrying on of the industry, such as oil and gas leases, assignments of oil and gas leases, division orders, supplemental division orders, and tabulations showing the separate interests which it was necessary for the named defendants alone to deal with during a typical month (July 1949) in making distribution under division orders and in computing and paying the amount of severance tax due the State. These ownership accounts handled by the fifteen named defendants alone amounted to around 20,000 at the time the exemption amendment was passed in 1949. There were, of course, other thousands of oil and gas interest holders' accounts not included in the reports made by the fifteen named de-

fendants. Typical copies of the forms of reports of production, with detailed information required by the law to be filed with the commissioner by the producers and first purchasers, were also introduced in evidence. All evidence submitted in the case by agreement of parties dealt with the methods, manner and customs of the oil and gas industry in carrying on its production business with all its complications. This evidence was introduced so the court could have some understanding of the methods used or which could possibly be used in collecting promptly and effectively the severance tax on gas and oil production as it comes from the ground and to allow the court to determine what the intention of the legislature was with reference to the 1949 tax exemption, to whom the legislature intended to give the exemption and whether it was possible from any practical standpoint to apply the amendment and allow the exemption to every owner of any oil or gas interest in the State of New Mexico.

The facts stipulated in the trial court show that it is the generally accepted practice in the oil and gas industry to carry on exploration and development operations under oil and gas leases entered into between the fee or mineral owners, who are commonly referred to as the lessors, and the individual or corporation who acquires the lease rights, who is commonly referred to as the lessee. Such oil and gas leases give and grant to the lessee the exclusive right of exploration and development of the leased premises with the right to produce the oil and gas and kindred substances therefrom, and such leases are usually granted for a term of five or ten years, and as long thereafter as oil and gas, or either of them, is produced from the leased premises. Such leases usually provide for the payment to the lessor of a royalty of 1/8 of all the oil and gas produced, saved and marketed from the premises covered by the lease. The terms and conditions of the various producing leases in New Mexico vary in detail, but all are substantially the same in substance. Typical forms of oil and gas leases executed by the then owners of the minerals in which one or more of the defendants herein is interested as a lessee or assignee and which cover actual producing properties in New Mexico were introduced.

There are some instances where oil and gas leases are entered into which provide for the payment of royalties to the lessors in excess of 1/8 of the oil and gas produced, saved and marketed from the leased premises. All payments or deliveries of oil and gas in kind made under the terms of the lease to the lessor based on the production of oil and gas from the leased premises are universally referred to in the oil and gas industry as "royalty payments".

The interest of the lessee in the oil and gas which remains after accounting for the royalty to the lessor under the terms of the lease is commonly referred to as the "working interest", and is the interest out of which the lessee must pay the cost of exploration, development, and of operating and maintaining the lease. One of the working interest owners is normally the operator of the wells on the leased premises.

There are many instances where the owners of oil and gas leases in selling or assigning the same provide for the transfer of interests in the production of oil and gas from the leased premises to persons other than the lessors. These interests are most generally retained by the lessee or the assignor in assigning the lease. Where such interests continue for the life of the lease they are commonly referred to in the industry as "overriding royalties".

Where such interests terminate when the lessee or person entitled to the same receives a certain amount of money from his share of the production, they are commonly referred to in the industry as "oil payments" or "obligations payable out of production".

Typical and actual assignments providing for overriding royalty payments and obligations payable out of production were introduced in evidence.

The interests of both the lessor and the lessee in oil and gas leases are assignable in whole or in part. Likewise, interests in overriding royalties and obligations payable out of production are assignable in whole or in part.

The original holders of such interests frequently make fractional assignments of the same to other persons who, likewise in turn, make fractional assignments of the interests which they receive to other persons with the result that the original interests in the production become repeatedly divided and subdivided, and thereby the number of owners and holders of royalty and leasehold interests become multiplied, and the size of the respective interests of the various parties become smaller and smaller; these fractional interests at times amount to only a one-millionth or less of the oil or gas on a particular lease; the result being that the lessee or holder of the working interests in and to an oil and gas lease, or the purchaser of the oil and gas therefrom usually has to deal with a very large number of parties.

After the completion of a producing well before making distribution of the oil and gas produced therefrom, or of the amounts to be paid therefor, to the interested parties, including the lessors, working interest owners, owners of overriding royalties, and owners of obligations payable out of production, it is necessary for all of such owners to enter into a division order setting forth the interest owned by each party.

This order is used as the basis for the monthly distribution among all of the interested parties, so that an accurate account can be kept from month to month of any changes in ownership, and to prevent errors in distribution as between the interested parties.

The use of division orders for accounting purposes in making division and distribution of the production from oil and gas leases and the amounts to be paid therefor is a universally accepted practice in the industry and is necessary for accounting purposes. These division orders vary in detail, but in substance are the same.

In certain instances, distribution on the basis of a division order is made by the purchaser directly to the interested owners. In other instances, the purchaser of the production pays the entire purchase price to the working interest owner who is operating the property, and who in turn makes distribution to all interested parties. In each instance, the division order referred to above is used as the basis for distribution to the interested parties.

Where the purchaser makes distribution of the entire purchase price to one of the working interest owners, this arrangement is commonly referred to as a "100% division order", in which case the purchaser has no record of the ownership of the royalty or overriding royalty, if any, or the working interest or other owners of interests in such oil and gas.

In all division orders used as a basis for distribution among the interested parties, the party making distribution requires all of those interested in the production, including royalty owners, owners of overriding royalty, and owners of obligations payable out of production and working interest owners, to join in the division order. It is also usually necessary in such cases for lien holders to join in the division order as in many instances mortgages provide for the payment to the mortgagee instead of the record title holder.

Prior to the issuance of Regulation 1–A by the Commissioner of Revenue of the State of New Mexico hereinafter referred to, usually the party making distribution of the amounts to be paid for the production among the various parties interested, deducted the severance tax payable on account of their share of the production, and remitted the same to the Bureau of Revenue of the State of New Mexico.

Typical and actual forms of division orders covering production leases in New Mexico were introduced.

After a division order has once been entered into establishing the ownership of the production of oil and gas as of a certain date from a particular property for the purpose of distributing the amounts

to be paid therefor, it is necessary to make changes from time to time on account of the sale or transfer in any manner of any of the interests involved described above. In order to keep account of these transfers, it is the prevailing practice in the industry to require the parties involved in any such transaction to enter into a "transfer order" agreeing to a change of the division order on account of the change in ownership of the interests involved.

There was introduced a statement showing the large number of separate interests that it was necessary for defendants to deal with during a typical month in making distribution under divison orders, and who must be taken into consideration in computing and paying the amount due the State of New Mexico under the Severance Tax Act. These figures vary from month to month to reflect various changes in ownership of leasehold, royalty and other interests.

The following regulation, known as Regulation 1–A, was issued by the Commissioner of Revenue of the State of New Mexico in connection with the administration of the Severance Tax Act, which regulation became effective as of the 10th day of June, 1949.

"Severance Tax Regulation No. 1–A
"Pursuant To the authority granted in Chapter 103 of the New Mexico Session Laws of 1937, as amended, the following regulation hereby is promulgated:

"1. Where the person actually engaged in the operation of severing crude oil from the soil, also, products, such producer must file the return required by Chapter 103 of the Laws of 1937, as amended, with the New Mexico Bureau of Revenue and pay the Severance Tax thereon.

"Where the person actually engaged in the operation of severing crude oil from the soil does not refine it into gasoline and/or other petroleum products, but sells it to another person, either for refining in the State of New Mexico, or for export from this State, then and in that case, such purchaser, rather than the producer, must file the return required by Chapter 103 of the Laws of 1937, as amended, with the New Mexico Bureau of Revenue showing the total amount of his purchases and pay the severance tax thereon.

"2. Where the person actually engaged in the operation of severing natural gas from the soil, also, markets such natural gas for consumption, either commercially or for domestic purposes, such producer must file the return required by Chapter 103 of the Laws of 1937, as amended, with the New Mexico Bureau of Revenue and pay the severance tax thereon.

"Where the person actually engaged in the operation of severing natural gas from

the soil does not market such natural gas for consumption, but sells. it to another person, either for beneficiating or marketing for consumption, either commercially or for domestic purposes, then and in that case, such purchaser rather than the producer must file the return required by Chapter 103 of the Laws of 1937, as amended, with the New Mexico Bureau of Revenue showing the total amount of his purchases and pay the severance tax thereon."

After issuance of this regulation, apparently made in an endeavor to carry out in some manner the provision of the 1949 amendment authorizing an exemption, the Commissioner ruled that he would allow the exemption to only those parties whom he required to file the detailed reports and remit the tax to him, that is, the reporting taxpayers, and not the owners of interests in the oil and gas severed.

There are instances where purchasers of oil and gas in the State of New Mexico do not actually produce oil and gas in the State of New Mexico; as, for example, the defendant, Stanolind Oil Purchasing Company, is a purchaser of oil in New Mexico, but does not itself own any oil and gas leases in New Mexico, or have any interest therein, but is strictly a purchaser of oil and as such remits the severance tax to the State of New Mexico, and makes a proportionate deduction in making payments to the various interested parties pursuant to its division orders. In such instances, the purchaser has no interest in the oil and gas at the time of its severance from the soil.

There are many instances where oil and gas lease owners or producers of oil and gas in the State of New Mexico do not actually produce oil and gas in any one year having a gross value in excess of $200,000.00.

There are probably not over two or three instances where owners of royalties, or overriding royalties predicated upon the production of oil and gas in New Mexico, receive as much as $200,000.00 on account of their interest in any one year.

Most of the defendants own interests in a large number of producing properties in the State of New Mexico. The oil and gas produced from such properties is usually purchased by more than one purchaser. The respective purchasers of the oil and gas produced do not have any record of the oil and gas purchased by other companies in New Mexico, and therefore have on means or method of knowing when a particular producer or other person interested in oil produced from such property has produced oil and gas in the State of New Mexico having a gross value of $200,000.00 in any particular period of time.

There are numerous instances where an individual or corporation may own a working interest, royalty or overriding royalty or other interests under several leases covering different tracts, some of which may be widely scattered and which interests may vary in amount. The owner of any particular oil and gas lease, or the purchaser of oil and gas therefrom, has no means or method of determining when any particular person or corporation, having an interest in the oil and gas produced from any particular lease, has any other working interest, royalty or overriding royalty or other interest in other leases situated in New Mexico, or of determining whether or not the aggregate payments received by any such owner will equal $200,000.00 in any given period.

There have been numerous demands made by owners of royalty and other interests upon the defendants, who are required to report and pay the severance tax, that they be allowed the $200,000.00 exemption provided for in the Severance Tax Act before payment of the tax on their proportionate part of the production, and in some instances such demands have been made that one exemption of $200,000.00 be allowed as to oil, and another exemption of $200,000.00 be allowed as to gas.

There are numerous wells in the State of New Mexico which produce natural gas only. There are other wells that produce oil alone without gas in marketable quantities. Other wells produce oil and gas both of which are marketed by the operator, and all interested persons including owners of royalty, working interests and overriding royalties participate in both types of production either in kind or in the purchase price paid on the sale thereof.

The trial judge found and concluded that Sec. 2 of Ch. 103 of 1937 Session Laws, as amended by Ch. 65 of the 1949 Session Laws, raised the tax imposed upon oil and gas from two per cent. (2%) to two and one-half per cent. (2½%) of the value of such products severed and that the said 1949 amendment also provided "The taxpayer hereby is granted an exemption from taxation of Two Hundred Thousand ($200,000.00) Dollars annually, which shall be deducted from the gross value as herein defined before computing the tax." He further found that the word "taxpayer" as used in the said severance tax laws has a special or technical meaning and refers only to the persons required to file reports and remit the tax directly to the State; that if the word "taxpayer" were given its ordinary dictionary meaning so as to include all owners of any interest in oil or gas severed, the 1949 amendment, although raising the rate of taxation, would result in the State collecting $150,000.00 less annually than before the amendment.

The judgment of the trial court properly found that actual and identical controversies exist between plaintiff and the respective named defendants and between the plaintiff and unnamed defendants who were sued as members of the classes represented by the named defendants as to each of the questions set out in Paragraph 6 of plaintiff's first amended complaint and that the suit was properly brought as a class action, and the adjudication of the court extends to and is binding upon all members of the several classes of persons in the oil and gas industry in New Mexico who are represented by the defendants, the classes including producers of oil and gas, or both, royalty owners, owners of overriding royalties, owners of payments out of production, partial owners of working interests and purchasers of oil and gas.

It adjudged that the word "taxpayer" in the Severance Tax Act as amended has a special meaning and refers only to persons required to report and pay the tax directly to the State, and that only such persons (who are the producers and first purchasers named and ordered by the Commissioner to pay the tax) were entitled to the exemption. It adjudged that the taxpayer is entitled to a single exemption of $200,000.00 annually, regardless of the number and kind of natural resource products he owns and severs.

The court further adjudged that Sec. 4 of Ch. 65 of 1949 Session Laws is void as being in violation of Art. 4, Sec. 16 of the Constitution of New Mexico, because of the fact that Sec. 4 of Ch. 103 of New Mexico Session Laws of 1937 was being amended without such being expressed in the title of said amending act, Ch. 65 of the 1949 Session Laws.

From this judgment the defendants appealed, principally upon the ground that the lower court erred in holding that the 1949 severance tax law amendment granting an exemption to "the taxpayer" was limited to those persons only actually reporting and directly remitting the tax to the State. Defendants contended the court should have found that the word "taxpayer" meant each and every owner of any kind or fraction of interest in oil or gas at the time of severance and that each and every such owner was entitled to the exemption.

The plaintiff, the State of New Mexico, filed a cross appeal from the judgment on the ground that the trial court erred in finding the word "taxpayer" as used in the Severance Tax Act definite and certain, that it had a special or technical meaning in the act, and that it meant the reporting taxpayer. The State contended that the meaning of the word "taxpayer" as used in the said law is uncertain and indefinite and the $200,000.00 exemption provision embraced in Sec. 2, Ch. 65 of the 1949 Session Laws is void for the rea-

son that it is so ambiguous, vague, indefinite and uncertain as to oil and gas that it is impossible of application with reference thereto. In brief, the State's contention is that by reading the entire Severance Tax Act and applying proper rules of interpretation it cannot be definitely determined what the intention of the legislature was with reference to the exemption provision.

■ The question before us is to determine whether the term "taxpayer", whose ordinary meaning is a person who pays a tax, or a person who is chargeable with a tax, requires any interpretation. If the statute in which the term is used is clear and unambiguous, then judicial interpretation is not required. If, however, the word is used frequently in the same statute and used loosely in different parts of the act, sometimes seemingly to refer to one class of persons and at other times to another class, and, perhaps, at times to all classes, ambiguity may arise justifying judicial interpretation to ascertain the definite intention of the legislature so the court may correctly construe and enforce the laws as intended by the legislature of the State. If, however, after applying the various rules of interpretation to ambiguous language the court is unable to say what was the intention of the legislature, or that the intention of the legislature was one thing or the other or one

or both, then the law is invalid for uncertainty and vagueness. The meaning of such an act would be so indefinite and speculative as to make it impossible of application.

It will be necessary for us to examine in some detail the Severance Tax Law, which is found in Ch. 103 of the 1937 Laws, as amended by Ch. 65 of the 1949 Session Laws. The important changes made by the 1949 amendment were three: 1st, the amendment granting an exemption was inserted in Sec. 2 of the act. This amendment which is the center of controversy here reads as follows: "The taxpayer hereby is granted an exemption from taxation of Two Hundred Thousand ($200,-000.00) Dollars annually, which shall be deducted from the gross value as herein defined before computing the tax."

This is the only mention of an exemption in the entire act.

The second important amendment made by the 1949 Legislature raised the rate of taxation on the value of oil and gas severed from the soil from two per cent. (2%) to two and one-half per cent. (2½%), as well as raising the rate on certain other natural resource products.

The third important amendment was to Sec. 4, creating a Severance Tax Permanent Fund into which all monies in excess of $4,000,000.00 collected from

severance taxes should be placed and permanently held in such fund.

The first section of the Severance Tax Law provides that:

" * * * taxes hereby are levied on all natural resource products severed and saved from the soil of this State * * *.

"Such taxes shall be paid by the owner or proportionately by the owners thereof at the time of severance, and shall become due and payable monthly as herein provided, and shall operate as a first lien on all such products, which lien shall follow such products into the hands of third persons, whether in good or bad faith, and whether same shall be found in a manufactured or unmanufactured state."

The second section provides that the tax be computed and paid upon the gross value of the products severed at the rates named in the act and "Gross value is defined as being the sales value of the severed and saved product at the first marketable point." This second section as amended in 1949 also contains the schedule of tax rates and the provision in controversy above quoted with reference to the so-called exemption.

*Section 3 provides that all taxes shall be due and payable in monthly installments on or before the 15th day of the month next succeeding the month in which said products were severed and that the tax-payer on or before the 15th day of such succeeding month shall make out and file with the Bureau of Revenue a return for the preceding month, in form as prescribed by the Bureau, showing the business conducted by the taxpayer during the preceding month, the kind, quantity and value of products severed, the names of the owners at time of severance, the portion owned by each, the location of each place where severed and such other information as the Bureau may require.

This provision most certainly in defining what the taxpayer must do refers to the operator of a lease, the severer or the person who in the industry is called the producer. A simple owner of some small undivided interest in the oil or gas would not have and probably could not obtain the information required in the tax report. This part of the statute, even though it states the taxpayer must file the report, etc., certainly means the producer or operator of the lease. The producer, of course, in most all cases is an owner of an undivided interest in the oil and gas, an owner of a working interest, but there are usually numerous other owners of undivided fractional interests in the same oil and gas produced who have nothing to do with the actual work of the production.

This same Section 3 further provides that the "Commissioner of Revenue may, in his discretion, require the first purchaser

of said products to pay the tax hereunder, rather than the owner", and, further, that the taxpayer shall accompany the tax return with a remittance of the amount of the tax due.

The first purchaser who may be required by this provision to pay the tax may have no ownership or interest whatsoever in the oil or gas at the time of severance. Yet, under the act he is responsible for and required to pay the tax on all oil or gas purchased by him if the Commissioner of Revenue so requires.

Section 6 of the act reads as follows:

"Except as otherwise provided in this Act, the making of the reports required herein and the payment of said taxes shall be by those actually engaged in the operation of severing, whether it be the owner of the soil or another severing from the soil of another, or the owner of any of said products severing the same from the soil of another.

"The reporting taxpayer shall collect and withhold out of the value of said products so severed, the proportionate parts of the total tax due by the respective owners of the severed products at the time of severance."

This section refers to the person actually severing the oil or gas, regardless of whether he is the owner of any interest. It means the producer, the production company actually operating a lease.

In Section 7 we find the following: "Every person actually engaged in the severing of any of said products mentioned herein from the soil or actually operating the properties from which said products are severed under contracts or agreements requiring royalty interest, excess royalty, or working interest, either in money or in kind, is hereby authorized, empowered, and required to deduct from any amount due or from anything due, the amount of tax herein levied before making such payments; * * *."

In this section undoubtedly again it is the producer who is referred to.

Section 8 of the act provides that where the severer is operating under contracts requiring payments direct to any owner of a proportionate share of the products severed, as prescribed in Section 7, sells such products to any person under contracts requiring the purchaser to pay all owners of such products direct, then the severer or actual operator may not be required to deduct the tax, but in such event such deductions shall be made by the purchaser before making payment to each owner of said products, but closes by providing: "* * * that nothing herein shall be construed as releasing the person severing the products from liability for the payment of said taxes."

Although the first purchaser under agreement with the producer must pay for the

oil directly to the owners and deduct from each their proportionate share of the tax, which the purchaser must send to the State, still this does not relieve the producer from the tax liability if for any reason the tax is not paid fully by the purchaser.

In Section 9 we find the following:

"Every person purchasing said products severed from the soil under contracts or agreements requiring such purchasers to make payments direct to the owners of said products is hereby authorized, empowered, and required, to deduct from any amount due any owner of such products the amount of the tax levied by the provisions of this Act before making such payments.

"All persons required to deduct from amounts due to others the tax herein levied shall file with the Bureau of Revenue the reports herein required and shall at the same time pay to said Bureau the amount of the tax so deducted or withheld under the provisions of this Act; Provided, that nothing herein shall be construed as releasing the person severing the products from the liability of payment of said taxes."

The act clearly makes three classes of persons chargeable with and liable for the payment of severance taxes on oil and gas. First, the owners of any interest in oil or gas severed, in proportion to their interest owned. This class is large, probably running to 25,000 to 30,000 persons and com-panies scattered throughout the United States and in many foreign countries. It changes and increases monthly by the constant sale, transfer and further division of interests and the death of parties whose interests pass to heirs or devisees. It also continuously increases by the bringing in of new oil or gas fields. Second, the producers who are chargeable with the tax on all products severed by them, regardless of what, if any, their ownership is. This second class probably numbered only about 270 in the year 1949. Third, the first purchasers are liable for the collection and payment of the tax on all products purchased by them if the Commissioner of Revenue, in his discretion, designates the purchaser to report, collect and pay the tax. This third class are likewise small in number.

It is obvious that the reason for the provisions in the act requiring the producers and the first purchasers to make the detailed reports to the Bureau and to withhold and deduct from payments due to each owner his proportionate part of the severance tax due and further requiring such producers and first purchasers to pay and remit the severance tax on all the products so handled by each of them was to facilitate and expedite the collection of these taxes monthly, promptly and without delay and expense and before the products would be taken out of and beyond the State of New Mexico.

Under the provisions of the act clearly the severer (the producer) is legally liable for the payment of the tax. He is chargeable with the payment of the tax on all oil and gas produced by him, regardless of who or how many own it, and regardless of what, if any, interest he owns in the product severed. Likewise, the original purchaser is clearly liable for the payment of the tax on all oil and gas purchased by him, whether or not he had any ownership in it at the time of severance. We believe these parties, who may not own any interest in the product at the time of severance but are required to pay or remit the tax directly to the State even though they have withheld and collected it from the various severers, may, within the general broad definition of the word, be deemed taxpayers. But are they the taxpayers, and the only taxpayers, which the legislature had in mind and to whom it intended to grant the exemption in the amendment found in Section 2?

In connection with taxation the granting of an exemption is the freeing from a tax liability which others may be subject to, the freeing or lightening of the burden of the taxpayer, relieving or lessening the load carried.

While the producer and the original purchasers, those found by the lower court to be the persons entitled to the exemption, are reporting taxpayers, they do not bear the burden of the tax. They make the tax report and withhold the taxes from the various and numerous interest owners and pay and remit the same to the Commissioner of Revenue. But the tax they pay and remit they are authorized and required under the law to withhold from the payments due from them to the various interest owners in proportion to the owners' respective interests. The producers or purchasers as such do not actually bear the burden of taxation because all the taxes they remit to the State they have already collected from the various interest owners. Did the legislature intend to grant these reporting taxpayers, who are really acting as agents or instruments of the State in collecting and facilitating the payment of the tax, an exemption from taxation when they do not as such bear any ultimate burden of the tax? We entertain some doubt that this was the intention of the legislature. Such a construction would result in really granting compensation or a bonus to be kept by or paid to the producers and purchasers. They who collect the full tax due from all the interest owners would then hold out from the amount remitted to the State the amount of the exemption as bonus to themselves. While the legislature may have intended the word "taxpayer" as applied to the exemption to mean the reporting taxpayer as definitely concluded by the lower court, we seriously doubt that such was the definite intention and therefore

believe the findings, conclusions and judgment of the lower court on this interpretation of the statute erroneous.

For the same reasons given compelling us to disagree with the lower court in holding that the meaning of the word "taxpayer" as used in the exemption provision was definite and certain and that it had a technical and special meaning, that is, the reporting taxpayer, the producer and original purchaser, we also are unable to believe that it was the intention of the legislature to include such producers and original purchasers as a part of that class designated "taxpayers" along with all persons owning an interest in the oil and gas severed. Also, if the term is construed to mean all persons chargeable with the tax, then the owner of any interest in the oil or gas produced would each receive the benefit of an exemption and the producers and purchasers would receive the bonus or compensation to be paid for filing the reports and remitting the tax. This would come out of what remained of the tax to be paid after exemptions were allowed and deducted for all owners of any interest. Neither the plaintiff nor the defendants have gone so far as to contend that the exemption covered all such taxpayers, nor that such could have been the legislative intention.

We now come to the question presented by the State's cross appeal. Both plaintiff and defendants admit that the word "taxpayer" used many times in various provisions of the severance tax law was rather loosely and carelessly used, probably sometimes referring to the producers, other times to purchasers, at times to owners of any interest in oil or gas severed and, possibly at times, to more than one of these classes. However, the defendants contend that when the term "taxpayer" was used in the exemption provision of the 1949 amendment it was definite and meant only owners of some interest in oil or gas severed, while the State contends that the exemption provision is void for the reason that it is ambiguous, vague, indefinite and uncertain as to oil and gas and that it is impossible of application with reference thereto.

We have concluded that this contention of the cross appellant, State of New Mexico, is correct. We shall set forth briefly the proof and reasons which convince us that it is extremely doubtful that the legislature intended to grant this so-called exemption to every owner of any interest in oil and gas, under all the facts and circumstances existing and known to the legislature at the time of the passage of the amendment in 1949.

The oil and gas industry is one of the most important industries in New Mexico and has become an essential part of our economy. The state government is vitally

interested in seeing the industry carried on and further developed for the very good reason that a large part of the taxes collected by the State to finance and support our state government are collected in various forms of taxation from this industry. The severance tax collections constitute about one-fourth of the total monies going into the State General Fund Receipts from all sources and the severance tax on oil and gas alone constitutes about nine-tenths of all severance taxes collected. About twenty-seven per cent. (27%) of the total severance tax on oil and gas would be released and lost to the State if the so-called exemption was granted to the owners of any interest in oil and gas severed. The fifteen named defendants who were producers and original purchasers filed exhibits showing it was necessary for them to keep about 20,000 separate individual accounts of gas and oil interests owned by persons in leases they operated or by persons whose oil or gas they purchased. These many accounts were necessarily kept by the defendants to enable them to make prorata payment for oil and gas to the various owners of undivided interests and to deduct and send to the State the severance tax due proportionately from each owner. With only these fifteen named defendants being required to keep about 20,000 accounts, the total accounts of owners of interests in oil and gas in producing fields in New Mexico would probably run at least 25,000 to 30,000 in 1949 and would, of course, continuously multiply as interests were further divided and sold, transferred on account of death and by the bringing in of new wells and fields. Many people and companies own different kinds of interests and different sized interests in the oil and gas leases covering different land. A producer on a certain lease is duty-bound to know and can learn the many owners who have an interest in the oil and gas severed from the land he is operating and thus he could keep informed monthly just what the value was of the oil and gas produced belonging to each undivided interest owner, so that after such owner had used up his exemption the producer could start withholding the prorata share of the severance tax due from such owner. But how can the producer know when the owner of an interest has used up his exemption when that same interest owner without knowledge of the producer has interests in one or many more oil or gas operations in New Mexico that the producer does not operate and does not know anything about? If the exemption is applied to every owner of any oil or gas severed in New Mexico, the entire system of making reports, keeping accounts and making collections, as set forth as an important part of the Severance Tax Law, would have to be changed or abandoned. At the present time under the law and the custom of the producers, of which there are about 270 in New Mexico,

each keeps detailed accounts of all the ownership interests in each lease he operates under and sends in the reports and taxes to the State. The provisions of the law enable the State to collect and keep account of the production and the taxes due at a nominal expense. We can see no way the producers or purchasers could keep track of the exemptions to be allowed, but this would be necessary, before the amount of tax, if any, due from each interest owner could be paid. We have had no explanation from defendants as to how this accounting could possibly be kept by the industry. Defendants merely say the State would have to keep the accounting, though no proper, efficient or satisfactory method has been suggested or explained.

The Severance Tax Act provides for the very prompt and inexpensive collection of the oil and gas taxes. They must be paid by the producers or original purchasers by the 15th of the month following the calendar month of severance. The detailed tax reports must also be filed at that time. This is the same system used by other neighboring states which produce large quantities of oil and gas. It is the result of long years of experience in the industry in working out a prompt, effective, inexpensive system of collecting the tax, with the work and expense largely falling on the producers and first purchasers. If we should adopt the construction sought by defendants, the satisfactory system of collection provided for in the Severance Tax Law, which has resulted in efficient, prompt and inexpensive enforcement, would in effect be abandoned, repealed and nullified. In its place the State would probably be required to set up an army of accountants, investigators, stenographers and clerks to endeavor to get reports from all lands of the State producing oil and gas, keep separate accounts for every person owning any interest in oil and gas anywhere and everywhere in the State, keep track of interests that are constantly being divided and transferred and new interests becoming subject to tax because of new wells or fields. With an army of such employees and at an enormous expense we do not believe the tax would or could be promptly and effectively collected. There would be great delay in the thousands of accounts in determining just when the owner of an interest in one or many leases had reached the point where his exemption was used and the tax was to be paid.

We believe, if the amendment were given the meaning contended for by defendants, the enforcement of the entire act and the collection of the taxes would from any practical standpoint be impossible and we cannot believe that was the legislative intent. Though we believe such a construction would make effective enforcement impossible, even an earnest effort resulting in lax and improper enforcement would cost the State a large percentage of the

tax collected. Such an expense, added to the twenty-seven per cent. (27%), which the exemption alone would amount to, would apparently mean the State was depriving itself of one-half or more of the entire tax, due to exemptions granted and the enormous expense of collection and enforcement. We are aware that the fact that a statute may create hardship or increase burdens is not sufficient to render it invalid, but such is not the case here. We believe interpretations contended for by defendants would largely destroy the effectiveness of the whole Severance Tax Act as applied to the oil and gas industry and that it is impossible of application. We have grave doubt that the legislature had such an intention.

The very Sec. 2 of Ch. 65 of 1949 Session Laws which contained the controversial provision as to the exemption contained a provision raising the rates of taxation. It raised the severance tax on oil and gas from two per cent. (2%) to two and one-half per cent. (2½%). It is hardly consistent with the defendants' contention that at the very time the legislature increased the rates it intended to reduce its total revenue by an exemption to every interest owner of $200,000.00. The increase in rates and the creation of the Permanent Severance Tax Fund found in Sec. 4 of the Act, to accrue from the revenues in excess of $4,000,000.00 is an indication that the legislature intended a substantial increase in revenues from the amendment instead of a substantial decrease or loss and destruction of this revenue. We fail to see how this exemption provision can be so construed as to give it sensible effect.

In the fiscal year of 1947–48, the fiscal year immediately preceding the convening of the legislature, the State collected, by way of severance tax, $2,009,863.50, of which $1,820,472.56 was from the oil and gas part of the severance tax. In Sec. 4 of the Act, as amended, the legislature created a severance tax permanent fund which was to receive all moneys in excess of $4,000,000.00 collected annually by way of severance tax. The first $4,000,000.00 was to be placed in the general fund. Since the legislature must have been aware that the approximate total revenue from severance tax in the immediately preceding fiscal year was only slightly in excess of $2,000,000.00, the legislature, in creating the severance tax permanent fund must of necessity have contemplated a substantial increase in revenue from this source; otherwise the attempt to create a Permanent Severance Tax Fund was a nullity. This indication of the intention of the legislature is also contrary to the contention of defendants.

It will be noted that on March 12, 1949, Ch. 65 was approved. On March 14, 1949, Senate Joint Resolution No. 23, Laws 1949,

p. 515, was approved and was submitted to the electorate in the general elections of 1950 as Constitutional Amendment No. 8. It provides as follows:

"Whereas, the wealth of the State of New Mexico consists, in a major part, of natural resources attached to or a part of its soil, And

"Whereas, the continual severance of such natural resources, without replacement of compensatory value, is detrimental to the welfare of the State of New Mexico, And

"Whereas, it is essential to the preservation of the wealth of this state, that a permanent trust fund be created, through the medium of taxation on the severance of such natural resources, to replace the natural wealth of this state now being so depleted.

"Therefore:

"Be It Resolved By The Legislature Of The State Of New Mexico:

"Section 1. The legislature hereby is authorized, in addition to its authority to otherwise tax, to pass laws providing for the levy and collection of taxes upon the severance of natural resources, at such rate or rates as will justly compensate the State of New Mexico for the depletion thereof.

"Section 2. From the proceeds of severance taxes, the legislature may appropriate a sum not to exceed Two Million ($2,000,000) Dollars annually for immediate governmental uses. The balance of all money so collected, shall be covered into a fund in the office of the State Treasurer, to be known and designated as the 'Natural Resource Trust Fund'.

"Section 3. All sums covered into the 'Natural Resource Trust Fund' from taxes, and penalties and interests thereon, so collected shall forever be and remain a permanent trust fund, the corpus of which, shall never be expended, but may be invested in bonds of the United States of America, the State of New Mexico or any county, city, town, board of education or school district therein. The legislature may, by three-fourths vote of the members elected to each house, provide that said funds may be invested in other interest-bearing securities. All bonds or other securities in which any portion of the 'Natural Resource Trust Fund' shall be invested, must be first approved by the governor, attorney-general and secretary of state. All losses from such funds, however occurring, shall be reimbursed by the state.

"Section 4. Any interest, earnings or accruals from the investment of said 'Natural Resource Trust Fund' shall, for the first twenty-five (25) years after the approval hereof, be and become a part of the corpus of such trust fund and subject to the provisions of Section 3 hereof.

"Any such interest, earnings or accruals received after the expiration of such twenty-five (25) year period shall be appropriated by the legislature for the purpose of defraying the cost of the government of the State of New Mexico.

"Section 5. In the event of passage and approval of this resolution proposing the foregoing constitutional amendment the same shall be submitted to the people at the next general election."

It is difficult to reconcile the contention of the defendants that the $200,000.00 exemption applies to every one having an interest in gas or oil production with the principles set forth in Constitutional Amendment No. 8. Constitutional Amendment No. 8 is an indication of the considerable thought and study that must have gone into the creation of the Severance Tax Permanent Fund and indicates an intention upon the part of the legislature for the state to reimburse itself by the severance tax to the extent that the natural resources of the state were being depleted.

The exemption contended for would allow many millions of dollars worth of the State's natural resources to be annually severed from its soil and lost to the State forever without any compensation therefor whatsoever. If the legislature intended such magnanimous generosity, certainly we should in no way interfere, but after considering the so-called tax exemption amendment we are in serious doubt as to the intention of the legislature and find the said tax exemption provision of the 1949 amendment indefinite, uncertain and vague, and therefore invalid as applied to oil and gas severed from the soil of New Mexico. Safeway Stores v. Vigil, 40 N.M. 190, 57 P.2d 287; Hines v. Mares, 42 N.M. 556, 82 P.2d 786; State v. Alexander, 46 N.M. 156, 123 P.2d 724.

The defendants further contend that the lower court erred in finding, concluding and adjudging that Sec. 4 of Ch. 65 of the 1949 Session Laws is void for the reason that it clearly violates Art. 4, Sec. 16 of the Constitution of the State of New Mexico, in that the fact that Sec. 4 of Ch. 103 of the 1937 Session Laws being amended is not expressed in the title of Ch. 65 of the New Mexico 1949 Session Laws. The plaintiff asserts the title was insufficient and the section invalid.

Sec. 16 of Art. 4 of the Constitution of New Mexico provides: "The subject of every bill shall be clearly expressed in its title, and no bill embracing more than one subject shall be passed except general appropriation bills and bills for the codification or revision of the laws; but if any subject is embraced in any act which is not expressed in its title, only so much of the act as is not so expressed shall be void. * * *"

The title of Ch. 65 of the 1949 Session Laws is: "An Act to Amend Sections 76–1301, 76–1302 and 76–1320 of New Mexico Statutes, 1941, Annotated, Being Sections 1, 2 and 20 Respectively, of Chapter 103 of the Laws of 1937, Relative to the Levy, Collection and Enforcement of an Excise Tax Upon Natural Resource Products of this State."

■ In discussing the purposes of the said controversial provision in State v. Miller, 33 N.M. 200, 263 P. 510, 511, we said: "The purposes of the constitutional provisions are to prevent surreptitious 'log-rolling' legislation and to give general notice to all concerned of the character of proposed legislation." ·

It is noted that the title of the amendment is not phrased in general or broad terms but is very restrictive and specifies it is to amend Secs. 1, 2 and 20 of Ch. 103 of the Session Laws of 1937. But the act itself goes further than the title and including a specific and important amendment to Sec. 4 of Ch. 103 of the Session Laws of 1937. This amendment, which is in no way shown or referred to in the title of the 1949 act, is the last section, that is, Sec. 4 of Ch. 65 of the Session Laws of 1949, which very materially amended Sec. 4 of the Session Laws of 1937.

The title of the amending act could have been in general terms and yet would have been sufficient but here there was an attempt to amend specifically by pin-pointing in the title of the amending act of 1949 the sections in the 1937 act which were to be changed and amended. The title of the 1949 amending act certainly was misleading, because the act itself went far beyond anything revealed by the title when it amended Sec. 4.

■ A case where the facts seem almost identical with the present one was decided by the Supreme Court of Arizona and is quoted with approval at some length by us as ably setting forth the principal of law applicable to our case. In Taylor v. Frohmiller, 52 Ariz. 211, 79 P.2d 961, 964, the Arizona Court said:

"The title of the act plays a very important part therein for without some title there can be no valid legislation. The scope of the title is within the discretion of the legislature; it may be made broad and comprehensive, and in this case the legislation under such title may be equally broad; or, the legislature, if it so desires, may make the title narrow and restricted in its nature, and in such case the body of the act must likewise be narrow and restricted. As was said by Justice Cooley, in his monumental work on Constitutional Limitations, 7th Ed. page 212:

"' "As the legislature may make the title to an act as restrictive as they please, it is obvious that they may sometimes so frame it as to preclude many matters being in-

cluded in the act which might with entire propriety have been embraced in one enactment with the matters indicated by the title, but which must now be excluded because the title has been made unnecessarily restrictive. The courts cannot enlarge the scope of the title; they are vested with no dispensing power. The Constitution has made the title the conclusive index to the legislative intent as to what shall have operation. It is no answer to say that the title might have been made more comprehensive, if in fact the legislature have not seen fit to make it so." '

"With these principles for our guidance, let us examine the title of the act. Had the title of the act stopped at the first comma, it would have been broad in its scope, and one who read the title would have been advised thereby that any matter relating to unemployment compensation might be found in the body of the act. But the title further states that it is amendatory of certain named sections of a certain specified act. We think the natural reaction of one who read the title would be that the only portions of chapter 13 which were to be amended were the particular sections set forth in the title of the act, and that he would be led to believe that any amendments to be made to chapter 13 contained nothing which was not germane to the matters dealt with in the sections named. It seems to us that the construction of the section of the constitution in question which most truly follows its spirit without being so narrowly technical on the one side so as to substitute the letter for the spirit, or so foolishly liberal on the other as to render the constitutional provision nugatory, is that when it appears from the title of the act that certain specific provisions of another act are to be amended, the body of the amending act may contain only matter which is reasonably germane to the subject matter of the sections which are stated by the title to be the subject of amendment, and may not go to the extent of amending sections not named in the title and which refer to matters not naturally connected with the subject matter of the particular sections which are to be amended. We think this rule is upheld by an overwhelming weight of authority where the facts were similar to those of the present case. A precisely similar question has arisen in a number of other cases, such as State v. Bankers' [& Merchant's Mut. Ben.] Ass'n, 23 Kan. 499; City of St. Louis v. Tiefel, 42 Mo. 578; Walters v. Brown, 215 Ky. 196, 284 S.W. 1017; Pottawatomie County v. Alexander, 68 Okl. 126, 172 P. 436; Ex parte Hewlett, 22 Nev. 333, 40 P. 96, and these courts have followed the rule we have just stated."

See also State v. Candelaria, 28 N. M. 573, 215 P. 816, which is substantially in point as to facts and law with the present case. The said Sec. 4 of Ch. 65 of the Session Laws of 1949, being entirely with-

out the scope of the title, violates the above mentioned provision of our State Constitution and is, therefore, invalid and void and the trial court was correct in so holding.

For error in failing to adjudge invalid the severance tax exemption provision as applied to gas and oil, the judgment must be reversed. The cause will be remanded with a direction to the district court to set aside its judgment and enter judgment in conformity with the views herein expressed.

It is so ordered.

LUJAN, C. J., and SADLER, McGHEE, and COMPTON, JJ., concur.