800 P.2d 184

**LOS QUATROS, INC., a New Mexico corporation, Plaintiff–Appellee,**

v.

**STATE FARM LIFE INSURANCE COMPANY, a New Mexico corporation, and Southwest Mortgage Company, a New Mexico corporation, Defendants–Appellants.**

No. 18443.

Supreme Court of New Mexico.

Aug. 23, 1990.

Sutin, Thayer & Browne, Sasha Siemel, Tila Fleming Hoffman, Albuquerque, for defendants-appellants.

Cole & Myers, David Campbell, John A. Myers, Albuquerque, for plaintiff-appellee.

## OPINION

MONTGOMERY, Justice.

The last sentence of NMSA 1978, Section 48–7–19(A) (Repl.Pamp.1987), enacted in 1983, provides: "There shall be no enforcement of a prepayment penalty in said mortgages." The phrase "said mortgages" means, the parties to this appeal seem to agree, real property loans made or assumed between March 15, 1979 and October 15, 1982. The mortgage in this case represents such a loan, and it contains a prohibition on prepayment by the obligor. The questions on this appeal are whether the statute is properly construed to prevent enforcement of this prohibition and, if so, whether it unconstitutionally impairs the obligations of a contract.

The district court applied the statute as written and entered a declaratory judgment in favor of the obligor, declaring that the ban on prepayment could not be enforced.[1] The mortgagee appeals, raising essentially two issues of statutory construction along with the constitutional issue just mentioned. We affirm the judgment of the district court.

### I.

The loan in this case, in the principal amount of $600,000.00 and bearing interest at the rate of 12⅞% per annum, was made on October 17, 1980 by American Bank of Commerce to Mr. and Mrs. Pickard. It was secured by a mortgage on certain commercial, nonresidential real estate in Bernalillo County. The mortgage note contained the following provision regarding prepayment: "This Promissory Note may not be prepaid in full or in part during the first twelve loan years."[1] Subsequently, the bank sold the note and mortgage to appellant State Farm Life Insurance Company. (The other appellant, Southwest Mortgage Company, services the note and mortgage as agent for State Farm.) On June 15, 1982, the appellee, Los Quatros, Inc., purchased the property subject to the mortgage and assumed the Pickards' obligations under the note and mortgage.

In 1983, Los Quatros began to try to market the property subject to the mortgage. Its attempts to sell the property, according to the papers submitted to the district court, failed because State Farm would not consent to prepayment of the loan and would not approve a transfer of the mortgage unless the purchaser would assume the current loan or a new loan at 12⅞% interest, which was above the then-current market rate for real estate loans in the applicable market. In March 1988, Los Quatros sought to prepay the note without having sold the property and without a

---

1. In addition, the note provided: "Privilege is reserved by Maker to prepay in whole or part the unpaid principal balance with accrued interest thereon to date of payment or to prepay on account of principal $1,000.00 or any multiple thereof on any installment date after the first twelve loan years, upon giving 60 days written notice to the holder of this Promissory Note of intention to make such prepayment, on condi-

tion that Maker will also pay, at the time of prepayment and in addition thereto, a premium computed on the amount of principal so prepaid of: Five percent (5%) during the thirteenth (13th) loan year, declining one-half of one percent (½ of 1%) in each loan year thereafter, but in no event will said premium be less than one percent (1%)."

declaration by State Farm that the loan was due. State Farm refused to accept the attempted prepayment. Los Quatros thereupon filed suit for a declaratory judgment that it had the right to prepay; State Farm counterclaimed for a declaratory judgment that Los Quatros had no such right. The parties stipulated to the facts and filed cross-motions for summary judgment. The district court granted Los Quatros's motion and entered a judgment declaring that Los Quatros could prepay the note.

On appeal, State Farm contends, first, that Section 48–7–19(A) does not apply to the loan in this case. It makes that contention for essentially two reasons: First, Los Quatros notes that the quoted sentence is part of legislation enacted in 1983 relating to "due-on-sale" provisions in real property loans, and Section 48–7–19 specifically deals with such loans made or assumed during the period March 15, 1979—October 15, 1982 (the "window period") and prohibits the lender from exercising its rights under a due-on-sale clause except as permitted in the section. Los Quatros argues that the prohibition on enforcement of a prepayment penalty in the last sentence of the section applies only when there is a sale of the property and the lender is seeking to exercise one of its options under a due-on-sale provision in the mortgage. In other words, argues State Farm, Section 48–7–19 should be construed as applicable only when there is a sale of the property and the lender is exercising an option under the due-on-sale clause.

State Farm's second statutory-construction argument is that Section 48–7–19 should be construed as applicable only to loans secured by residential real estate consisting of not more than four housing units. It makes the argument because of the statute's historical background and in order to avoid a conflict with the federal Garn–St. Germain Depository Institutions Act of 1982, which preempts the field of due-on-sale clauses in real property loans. *See* 12 U.S.C. § 1701j–3(b)(1) (1988); 12 C.F.R. § 591.5(a) (1989).

Finally, State Farm makes the broad assertion, without much supporting authority, that Section 48–7–19, if applied to the prohibition on prepayment in its mortgage, is unconstitutional as impairing the obligations in its contract and thus violating Article I, Section 10, of the United States Constitution and Article II, Section 19, of the New Mexico Constitution.

We shall discuss each of State Farm's arguments in turn.

## II.

■ Section 48–7–19 became effective on April 7, 1983 as Section 5 of N.M. Laws 1983, Chapter 314. Subsection (A), set out in full in the margin,[2] begins with the phrase, "In the exercise of its options under a due-on-sale clause," and continues with the prohibition on a lender's accelerating the indebtedness and declaring the loan due and payable. When the last sentence of the subsection is read in context, State Farm argues, the statutory ban on enforcement of prepayment penalties applies only to a lender who is exercising an option under a due-on-sale clause. The state act defines such a clause as a provision in a contract involving a real property loan which authorizes a lender, at its option, to accelerate the indebtedness if all or any part of the property is sold or transferred. NMSA 1978, § 48–7–16(A) (Repl. Pamp.1987). Accordingly, State Farm con-

2. A. In the exercise of its options under a due-on-sale clause, in a real property loan made or assumed between March 15, 1979 and October 15, 1982, a lender shall be prohibited from accelerating the indebtedness and declaring the loan due and payable and shall be limited in increasing the interest rate upon an assumption of the loan upon the transfer of the real property to the existing contract rate of interest plus an increase in the rate of interest not greater than two percentage points and a fee to transfer the real property loan of not greater than one percentage point of the unpaid principal balance of the real property loan at the time of the transfer. On each succeeding assumption of the real property loan on the same property, the lender may increase the contract rate of interest and charge the transfer fee as provided in the previous sentence. There shall be no enforcement of a prepayment penalty in said mortgages.

tends, the last sentence of Subsection (A), when read in context, should be construed to apply only when the property securing the loan is sold or transferred (which it concededly has not been in this case) and the lender is attempting to exercise its option to accelerate the indebtedness or to demand an increase in the interest rate as a condition of approving an assumption of the loan. While State Farm's contention has some facial plausibility, we reject it for the reasons that follow.

State Farm resorts to some of the usual canons of statutory construction, such as the rule that statutes should be construed as a whole and the statutory language taken in context. *See Fort v. Neal,* 79 N.M. 479, 481, 444 P.2d 990, 992 (1968); *State ex rel. Witt v. State Canvassing Bd.,* 78 N.M. 682, 691, 437 P.2d 143, 152 (1968). In construing a statute, we attempt to determine and effectuate its purpose or, as it is sometimes said, the "intent of the legislature." *See* NMSA 1978, § 12–2–2 (Repl.Pamp. 1988); *Bradbury & Stamm Constr. Co. v. Bureau of Revenue,* 70 N.M. 226, 231, 372 P.2d 808, 812 (1962). We thus need to answer the question: What is the purpose of the statute precluding enforcement of a ban on prepayment in real property loans made or assumed between March 15, 1979 and October 15, 1982?

To answer this question we should, as State Farm urges, review the history and prior condition of the law. *See Munroe v. Wall,* 66 N.M. 15, 18, 340 P.2d 1069, 1070 (1959). Chapter 314 of N.M. Laws 1983 (the 1983 Act) replaced N.M. Laws 1979, Chapter 45, Sections 1 through 4 (formerly codified as NMSA 1978, Sections 48–7–11 to –14 (Cum.Supp.1982) (the 1979 Act). The 1979 Act generally declared unenforceable due-on-sale clauses in mortgages on

residential property consisting of not more than four housing units. The legislature found that such clauses may constitute unreasonable restraints upon alienation to the detriment of the public welfare. 1979 N.M. Laws, ch. 45, § 1 (formerly § 48–7–11).[3] In the "purpose" section of the 1983 Act, the legislature found that continuation of the then current prohibition on enforcement of due-on-sale clauses would discourage investors from investing through mortgage bankers in New Mexico real property loans and suggested that the ability to increase the interest rate on assumed loans would enable such loans to be sold and thereby attract additional capital to this state. *See* NMSA 1978, § 48–7–15(C)(3) (Repl.Pamp. 1987). The legislature further found that state restrictions on enforcement of due-on-sale clauses had been preempted by the Garn–St. Germain Act, except as provided in Section 341(c)(1) of that act.[4] The legislature declared its intention to restrict, as permitted by federal law, the enforcement of due-on-sale clauses in "window period" loans—i.e., loans made or assumed during the period March 15, 1979 through October 15, 1982. As to all other loans, the legislature declared that, notwithstanding any provision of the statutory or common law of this state to the contrary, a lender may enter into or enforce a contract containing a due-on-sale clause. NMSA 1978, § 48–7–17 (Repl.Pamp.1987).

It is thus clear that Section 48–7–19(A) is intended to carry forward the 1979 Act's prohibition on enforcement of a due-on-sale clause in a window-period loan. *See State ex rel. Bardacke v. New Mexico Fed. Sav. & Loan Ass'n,* 102 N.M. 673, 676–77, 699 P.2d 604, 607–08 (1985). To the extent permitted by federal law, our legislature has reiterated the policy, reflected in the

---

**3.** The 1979 Act was applied in *State ex rel. Bingaman v. Valley Savings & Loan Association,* 97 N.M. 8, 636 P.2d 279 (1981). This Court held that due-on-sale clauses, where there is no showing of a substantial impairment of the lender's security interest, are unenforceable as unreasonable restraints upon alienation. This holding was based on common law principles and not necessarily upon retroactive application of the Act to mortgages executed before its effective date. The broad holding was qualified, however, in *Brummund v. First National Bank,*

99 N.M. 221, 656 P.2d 884 (1983), which held that a due-on-sale clause in a commercial mortgage and security interest covering commercial realty and personalty was not a restraint on alienation; *Bingaman* was distinguished as involving a transfer of residential property.

**4.** Section 341(c)(1) of the Garn–St. Germain Act is codified in 12 U.S.C. Section 1701j–3(c)(1) (1988).

1979 Act, of protecting the borrower (who will usually be the owner of the mortgaged property) from the inhibitory effects, as restraints on alienation, of the due-on-sale clause. This policy choice reflects a determination that in times of rising interest rates [5] the existence and potential for enforcement of due-on-sale clauses will operate to impair the marketability of borrowers' property, with a resultant burden on the state's economy. For loans other than window-period loans, the opposite choice has been made: Consistent with federal policy as reflected in the Garn–St. Germain Act, the legislature has declared that the existence and enforceability of due-on-sale clauses will encourage investors to invest in New Mexico real property loans and will thereby attract additional capital to the state. These policy decisions, unless they contravene some constitutional requirements, are for the legislature to make.

Given that the intent of the legislature is to afford protection to borrowers (to the extent permitted by federal law) in times of rising interest rates, what can be divined as to the legislative intent when interest rates are falling? The due-on-sale clause will seldom be invoked when the market rate is below the level set in the note; it would not serve the interests of the lender to declare the loan due and payable upon a transfer and then, after payment, re-lend the loan proceeds at a lower rate than was payable under the note in the first place. *See* G. Nelson & D. Whitman, *supra*, § 6.5, at 435 (due-on-sale clause used when current market interest rates exceed rate being paid by the mortgagor; any rational mortgagee would be only too delighted to accept prepayment of loan where interest rate is below current market rates). In times of falling rates, then, the lender can attempt to protect itself by prohibiting or restricting prepayment; such a restriction will "lock in" the interest rate stipulated in the note and prevent or retard the borrower from refinancing at a lower rate. *See id.* § 6.1, at 423.

The lender's desire for protection from the effects of rising rates typically can be achieved only, or perhaps chiefly, through the due-on-sale clause. While a lender might include a "call" provision in the note—requiring the borrower to pay at any time on demand—borrowers usually will not agree to call provisions unless they can be exercised only after passage of a certain length of time, such as the fifteen years provided for in the instant mortgage. Prepayment penalty provisions, however, usually are made effective from the outset of the loan and operate continuously while the loan remains outstanding, although they often will diminish in severity with the passage of time. For a prepayment penalty ban to be effective, therefore, it must apply at all times and not just when the borrower may choose to sell the property. State Farm's argument that the prohibition on prepayment penalties in the last sentence of Section 48–7–19(A) should be read to apply only when there has been a sale of the property and the lender has elected to declare the loan due and payable would offend common sense, because in that situation it would seem curious at least for the lender to declare the loan due and then prohibit or penalize its prepayment. *See McCausland v. Banker's Life Ins. Co.*, 110 Wash.2d 716, 757 P.2d 941 (1988) (en banc) (prepayment penalty prohibition and due-on-sale clause do not operate simultaneously; if lender elects on sale to accelerate the debt, it may not demand prepayment penalty, because payment after acceleration is not prepayment).

Despite, however, our notions of what is and what is not consistent with common sense in this area, it appears that lenders sometimes do attempt to collect prepayment penalties incident to due-on-sale clause enforcement. G. Nelson & D. Whitman, *supra*, § 6.5, at 434.

State law consistently has been unsympathetic to this type of "double dipping." * * * [A] few state statutes prohibit the enforcement of a prepayment penalty [if the prepayment] is triggered

---

5. *See* G. Nelson & D. Whitman, *Real Estate Finance Law* § 5.21, at 316 (2d ed. 1985) ("[The] major purpose [of the due-on-sale clause] is to enable mortgagees to recall lower-than-market interest rate loans during periods of rising interest rates.").

by the mortgagee's enforcement of a due-on-sale clause. Several courts have reached the same result without the benefit of a statute * * *.

Moreover, a federal Home Loan Bank Board [now Office of Thrift Supervision in the Department of the Treasury] regulation, promulgated in 1983, prohibits all lenders, whether federally chartered or not, from collecting prepayment penalties resulting from acceleration under due-on-sale clauses contained in loans secured by a home "occupied or to be occupied by the borrower."

*Id.* (citing 12 C.F.R. § 591.5(b)(2); other citations omitted).

From the state and federal restrictions on prepayment penalties incident to due-on-sale clause enforcement, one might infer that the intent of our legislature in prohibiting collection of prepayment penalties "in said mortgages," as set out in the last sentence of Section 48–7–19(A), was to implement such regulation in New Mexico and to prohibit prepayment penalties only when their collection is sought in connection with enforcement of a due-on-sale clause. However, it will be observed that, under the federal scheme, due-on-sale clauses are *permitted* as a general rule; the federal regulation banning prepayment penalties incident to such clauses is consistent with preventing double dipping. Under New Mexico's window-period statute, enforcement of due-on-sale clauses is *precluded;* hence there would be no point (no double dipping to prevent) in proscribing prepayment penalties only in this situation.

Sometimes the intent of legislation is hard to figure out. In that circumstance it is at least handy—if not best—to have an old shibboleth to fall back on, such as the rule that we look to the ordinary meaning of the words used in the statute and neither add words to, nor subtract words from, the statutory language unless necessary to carry out the legislative object or to prevent an absurdity. *See, e.g., Atencio v. Board of Education,* 99 N.M. 168, 655 P.2d 1012 (1982); *Bettini v. City of Las Cruces,* 82 N.M. 633, 485 P.2d 967 (1971). Here the statutory language is simple, direct and all-inclusive: "There shall be no enforcement of a prepayment penalty in said mortgages." As we have noted, "said mortgages" refers to real property loans made or assumed during the window period.

If we add to this plain-meaning interpretation the conclusion that the legislative purpose behind Section 48–7–19(A) is to protect the borrower under window-period loans during periods of both rising and falling interest rates, we come away with the further conclusion that the applicability of the sentence is not limited to the situation in which the lender seeks to enforce a due-on-sale clause. The statute's objective is to promote the alienability of land, whether interest rates are rising or falling. When they are rising, enforcement of due-on-sale clauses is prohibited (for window-period loans only); when they are falling, clauses (in window-period loans) preventing or restricting prepayment are not to be enforced. We hold, therefore, that the last sentence of the Section 48–7–19(A) applies whether or not there has been a sale and whether or not the lender has sought to exercise its options under a due-on-sale clause.

### III.

■ State Farm's second statutory-construction argument is easier to deal with than the first. The argument is that Section 48–7–19 should be construed as applicable only to the type of loan covered by the 1979 Act, that is, loans secured by an interest in residential property consisting of not more than four housing units. *See* N.M. Laws 1979, ch. 45, § 2(A) (formerly § 48–7–12). The reason for this limitation on the applicability of the current statute, State Farm submits, is that the statute creates an exception to the otherwise blanket preemption effected by the Garn–St. Germain Act and that the federal act permits such an exception only with respect to those types of window-period loans that were embraced by a due-on-sale clause restriction prior to the effective date of Garn–St. Germain, which was October 15, 1982. *See* 12 U.S.C. § 1701j–3(b)(1) (preemption of state law on restriction of due-

on-sale clauses); 12 U.S.C. § 1701j–3(c)(1) (exception to preemption for window-period loans). State Farm refers to a Senate Report constituting a portion of the legislative history of Garn–St. Germain and declaring:

> State legislatures may not expand the types of loans to which the window period applies—e.g. a state which presently restricts due-on-sale enforcement for single family loans * * * but not multifamily loans could not expand that restriction to apply to multifamily loans.

S.Rep. No. 536, 97th Cong., 2d Sess. 23 (1982), U.S.Code Cong. & Admin.News 1982, pp. 3054, 3077.

Since the 1979 Act prevented due-on-sale enforcement only with respect to loans secured by residential property consisting of not more than four housing units, and since Los Quatros's loan is secured by commercial, non residential property, State Farm contends that to apply Section 48–7–19 to the loan in this case would conflict with Garn–St. Germain's prohibition on expansion of state-law restrictions on due-on-sale clauses and hence that the state statute here should be construed to apply only to the type of loan covered by the 1979 Act.

We disagree, for essentially two reasons. First, as Los Quatros points out, the Garn St–Germain Act preempts state regulation of enforcement of due-on-sale clauses, not enforcement or restriction of clauses barring or penalizing prepayment of loans.[6]

Despite the complementary nature of the two kinds of provisions, *see* G. Nelson & D. Whitman, *supra*, § 6.1, at 423, we are reluctant to read into a federal statute preempting the field of due-on-sale clause enforcement a limitation on state authority to regulate a different economic phenomenon, namely, borrower's prepayment of their loans.

■ Secondly, the limitation on state authority argued by State Farm is found in the legislative history of the federal act, not in the federal statute itself. The exception to preemption in 12 U.S.C. § 1701j–3(c)(1)(A) permits a state to "otherwise regulate such contracts," "such contracts" being real property loans [7] originated in the state by lenders other than national banks, federal savings and loan associations and savings banks, and federal credit unions. There is no prohibition in the federal act on a state's "expansion" of the preexisting limitations on enforcement of due-on-sale clauses from those applicable to loans secured by another, broader type. We conclude, therefore, that even if a prohibition on prepayment penalties is governed by the restriction on window-period loans in the Garn–St. Germain Act, that Act does not prevent a state from enlarging the class of loans subject to the prohibition, so long as they are "real property loans" made or assumed during the window period.[8]

---

6. State Farm conceded below that an absolute prohibition on prepayment is equivalent to a prepayment penalty. As has been seen, *supra* note 1, the loan in this case contains both types of provisions—an outright prohibition on prepayment for the first twelve years of the loan, and a graduated penalty on prepayment after the twelfth year, depending on the loan year in which the payment is made.

7. "Real property loan" is defined as "a loan, mortgage, advance, or credit sale secured by a lien on real property, the stock allocated to a dwelling unit in a cooperative housing corporation, or a residential manufactured home, whether real of personal property[.]" 12 U.S.C. § 1701j–3(a)(3).

8. We do not read the Home Loan Bank Board's regulations as requiring a different conclusion. 12 C.F.R. § 591.2(p)(1) defines a window-period loan as a real property loan "made or assumed during a window-period created by state law

and *subject to that law* * * *." (emphasis added). The loan in this case was made and assumed during the window period and was subject to the law (the 1983 Act) which created the window period. Thus the loan meets the definition of a window-period loan, even though the loan was not subject to the preexisting state law, the 1979 Act. *But see* G. Nelson & D. Whitman, *supra*, § 5.24, at 347–48:

> The Regulation also expressly provides that a state with a window period cannot modify its law to extend the protection from due-on-sale enforcement to loans that were not of a type protected during the window period. [citing 12 C.F.R. § 591.2(p)(1) ] * * * Although the [Garn–St. Germain] Act itself does not limit its protection in this way, this result seems sensible in light of the Act's purpose of protecting the reasonable expectations of those who purchased property in reliance on state law.

Our construction of the federal Act neither protects nor defeats the borrower's reasonable

## IV.

■ We turn now to State Farm's constitutional argument. That argument is that Section 48-7-19's avowedly retroactive application to contracts (mortgages) made or assumed during the window period—which predated the effective date of the section— unconstitutionally impairs the obligations of those contracts. In particular, State Farm asserts, the invalidation (in effect) of a contractual provision banning prepayment of the loan constitutes just the type of proscribed impairment that the constitutional prohibitions are meant to prevent. As noted earlier, the argument is advanced under both the federal and state Contract Clauses.[9] Since Contract Clause analysis has been developed much more thoroughly under the federal clause than under the state, we shall discuss first the principles surrounding the federal clause and then follow with a brief consideration of the applicability of those principles to the clause under our state Constitution.

### A.

State Farm cites a single case in support of its federal Contract Clause argument, *Von Hoffman v. City of Quincy*, 71 U.S. (4 Wall.) 535, 18 L.Ed. 403 (1866), in which the United States Supreme Court held that statutes cannot constitutionally reduce existing rights of parties to a contract and that protected rights include those conferred by the laws in effect when the contract is made. If this were the last word on the subject, we might feel constrained to agree with State Farm, because it is clear that the statute in this case reduces to some extent State Farm's right to refuse a prepayment, which right the lender generally has under the common law even when the note is silent. *See* 55 Am.Jur.2d *Mortgages* § 397 (1971). But much water has flowed over the dam since *Von Hoffman*, and so we prefer to apply more modern Contract Clause analysis in deciding whether or not to invalidate this statute in this case.

For its part, Los Quatros likewise relies primarily on a single case: *Home Building & Loan Association v. Blaisdell*, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934), which at least is widely regarded as the "leading modern case" on the Contract Clause. *See* L. Tribe, *American Constitutional Law* § 9-9, at 615 (2d ed. 1988); L. Clarke, *The Contract Clause: A Basis for Limited Judicial Review of State Economic Regulation*, 39 U.Miami L.Rev. 183, 192 (1985). Here again, however, *Blaisdell*—which upheld as against a Contract Clause challenge a state law authorizing courts to extend mortgage redemption periods—does not represent the last word on the subject; a number of Supreme Court cases in recent years have refined the analysis and illuminated the applicable principles.[10] In *Blaisdell*, the Supreme Court said:

> [The Contract Clause] prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula.
>
> \* \* \* \* \* \* \* \* \* \* \* \*

---

expectations. Mr. and Mrs. Pickard could not reasonably have expected that they had an assumable loan insofar as the prepayment-penalty provision in their note was concerned; the 1983 Act came as something of an unexpected windfall to their transferee, Los Quatros. To be sure, the reasonable expectations of the lender, State Farm, have probably been undermined; but State Farm's protection, if any, from such legislative action lies in the federal or state Contract Clause (which we discuss below), not in the Garn-St. Germain Act.

9. "No state shall \* \* \* pass any \* \* \* Law impairing the Obligation of Contracts \* \* \*." U.S. Const. art. I, § 10, cl. 1. "No \* \* \* law impairing the obligation of contracts shall be enacted by the legislature." N.M. Const. art. II, § 19.

10. *E.g.* (in chronological order), *El Paso v. Simmons*, 379 U.S. 497, 85 S.Ct. 577, 13 L.Ed.2d 446 (1965); *United States Trust Co. v. New Jersey*, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977); *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978); *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983); *Exxon Corp. v. Eagerton*, 462 U.S. 176, 103 S.Ct. 2296, 76 L.Ed.2d 497 (1983); *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984); *National R.R. Passenger Corp. v. Atchison, T. & S.F. Ry.*, 470 U.S. 451, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985); *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987).

The economic interests of the state may justify the exercise of its continuing and dominant protective power notwithstanding interference with contracts.

290 U.S. at 428, 437, 54 S.Ct. at 236, 239. A similar formulation is set forth in the Court's most recent Contract Clause case:

[I]t is well settled that the prohibition against impairing the obligation of contracts is not to be read literally. * * * [I]ts primary focus was upon legislation that was designed to repudiate or adjust pre-existing debtor-creditor relationships that obligors were unable to satisfy. [Citing *Blaisdell*] Even in such cases, the Court has refused to give the Clause a literal reading. Thus, in the landmark case of [*Blaisdell*], the Court upheld Minnesota's statutory moratorium against home foreclosures, in part, because the legislation was addressed to the "legitimate end" of protecting "a basic interest of society," and not just for the advantage of some favored group.

*Keystone Coal Ass'n, supra* note 10, 480 U.S. at 502–03, 107 S.Ct. at 1251–52.

Many of the modern Supreme Court cases involved factors not present here. For example, in *Blaisdell* there was an emergency, and the relief afforded by the legislature was appropriately tailored to that emergency and limited to its duration. 290 U.S. at 445, 54 S.Ct. at 242. In *United States Trust* the state itself was a party to the contract; and thus the Court, out of concern that the state's own self-interest was implicated, refused to defer to the legislative judgment, as is customary in reviewing economic and social regulation. 431 U.S. at 22–23, 97 S.Ct. at 1517–18. In *National R.R. Passenger Corp.*, the impairing statute was a federal one, and so judicial scrutiny of the legislation was minimal, 470 U.S. at 472, 105 S.Ct. at 1455, which doubtless reflects a federal court's concern with principles of federalism lacking here. Nevertheless, despite the absence of these factors in this case, we find the Supreme Court's basic rationale in these and other cases applicable to the instant problem.

Perhaps the case providing the best overview of the appropriate methodology is *Energy Reserves Group, Inc. v. Kansas Power & Light Co., supra* note 10. There the Court reviewed a Kansas statute regulating the price of natural gas sold intrastate between a producer and a public utility, and held that it was not invalid under the Contract Clause. The Court noted, first, that "[t]he threshold inquiry is 'whether the state law has, in fact, operated as a substantial impairment of a contractual relationship.'" 459 U.S. at 411, 103 S.Ct. at 704 (quoting *Spannaus, supra* note 10, 438 U.S. at 244, 98 S.Ct. at 2722). It went on to say that "[t]he severity of the impairment is said to increase the level of scrutiny to which the legislation will be subjected," *id.*, or (as *Spannaus* put it) "the height of the hurdle the state legislation must clear," 438 U.S. at 245, 98 S.Ct. at 2723. In determining the extent of the impairment, it is relevant that the industry which the complaining party has entered has or has not been regulated in the past. *Energy Reserves*, 459 U.S. at 411, 103 S.Ct. at 704.

If the answer to the threshold inquiry is that the state regulation does indeed constitute a substantial impairment, the state "must have a significant and legitimate public purpose behind the regulation," so that there is some guarantee that the state "is exercising its police power, rather than providing a benefit to special interests." 459 U.S. at 411–12, 103 S.Ct. at 704–05. Finally, once a legitimate public purpose has been identified, the reviewing court must determine "whether the adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.'" 459 U.S. at 412, 103 S.Ct. at 705 (quoting *United States Trust, supra* note 10, 431 U.S. at 22, 97 S.Ct. at 1518) (brackets in original).

Applying this methodology, we determine, first, that in this case there is at least a significant (and perhaps a substantial) impairment of a contractual relationship. The substantiality of that impairment is open to question, since the debt itself has not been affected: The principal must be

repaid on time; the interest continues to accrue at the rate stipulated in the note; there is no drastic limitation on the lender's remedy such as the foreclosure moratorium in *Blaisdell.* We may assume that preventing prepayment is important to the lender, since the clause enables it to maintain the return on its loan portfolio at or above current market interest-rate levels. *See* G. Nelson & D. Whitman, *supra,* § 6.1, at 423. But we are not impressed that this frustration of the lender's expectations is unduly severe, particularly when we consider that the industry here—the banking industry—has long been extensively regulated.

■ So, if the regulation here could be characterized as "slight," it might not be necessary to proceed to the other inquiries detailed in *Energy Reserves.* However, it seems to us that even a "slight" impairment might be constitutionally suspect—at least under our state Constitution—if there were *no* legitimate public purpose behind the impairing statute. We are impressed by the idea, articulated in *Energy Reserves* and *Spannaus,* that, given that the prohibition on impairment is not absolute, an increasingly severe impairment must be justified by an increasingly important public purpose. This necessarily places legislative enactments at the mercy of judges' views as to the importance of the measures the legislature enacts, but such is the nature of judicial review. If the constitutional prohibition is not to be applied with "literal exactness," *Blaisdell,* 290 U.S. at 428, 54 S.Ct. at 236, the fate of legislation must necessarily depend on how the courts perform the often difficult task of balancing the importance of the legislation against the infringement of the interests protected by the Constitution.

We have already noted that the statute here has the purpose of promoting the alienability of land. While it might be said to advance the interest of a particular group—borrowers versus lenders—and thus to transgress the stricture in *Blaisdell* that the challenged statute abjure such favoritism and further a "basic interest of society" instead, 290 U.S. at 445, 54 S.Ct. at 242, we have no difficulty finding that promoting the alienability of land is a basic societal interest—even though the same 1983 Act which furthers this interest in window-period loans also promotes the countervailing interest of enhancing the secondary loan market by enforcing due-on-sale restrictions. The anti-prepayment-penalty legislation here is narrow in scope, applying only to loans made or assumed within a specific three-year period. We cannot say that its purpose is insignificant or illegitimate.

Finally, as to the existence of "reasonable conditions" and a "character appropriate to the public purpose" mentioned in *Energy Reserves,* we think the legislation here is sufficiently tailored to accomplishment of its purpose to withstand an attack on its constitutionality. We have, after all, a presumption in favor of that constitutionality, *Seidenberg v. New Mexico Board of Medical Examiners,* 80 N.M. 135, 452 P.2d 469 (1969); and State Farm points to nothing indicating that this particular legislation exceeds the bounds of reasonableness in carrying out the particular purpose it effectuates. Again, it applies only to a relatively narrow and finite class of loans. As does the United States Supreme Court, we " 'defer to legislative judgment as to the necessity and reasonableness of a particular measure' " in reviewing this economic regulation. *Energy Reserves,* 459 U.S. at 413, 103 S.Ct. at 705 (quoting *United States Trust,* 431 U.S. at 22–23, 97 S.Ct. at 1517–18).

### B.

Having rejected State Farm's challenge to the statute based on the federal Contract Clause, we can deal more briefly with its claim under the state clause. New Mexico has never spelled out a rationale or methodology for evaluating a claim of unconstitutionality based on our state Constitution, having simply rejected or accepted the attacks in particular cases without assigning much by way of reasons for the rulings.

Since this Court in *Rubalcava v. Garst,* 53 N.M. 295, 206 P.2d 1154 (1949), held

invalid a statute barring enforcement of an oral contract to leave property by will to the beneficiary of the contract when the statute was enacted after the death of the decedent and after performance of the contract, the Court has applied the state Contract Clause in a few other cases to hold that particular legislation did—or would if applied retroactively to the contract—violate the clause. *See State ex rel. Coll v. Carruthers*, 107 N.M. 439, 759 P.2d 1380 (1988) (upholding line item veto of appropriation affecting preexisting medical services contracts); *Cutter Flying Service, Inc. v. Straughan Chevrolet*, 80 N.M. 646, 459 P.2d 350 (1969) (prospectively applying statute allowing attorney's fee in suit on open account where suit filed after statute became effective); *Noffsker v. K. Barnett & Sons*, 72 N.M. 471, 384 P.2d 1022 (1963) (refusing to apply workers' compensation statute retroactively to accident occurring before statute became effective). In other cases the Court simply has found that the challenged legislation did not affect an existing contract. *See National Building v. State Board of Educ.*, 85 N.M. 186, 510 P.2d 510 (1973) (lease law directing state agency as lessee to move to new location did not impair obligations in lease, since lease contemplated termination if legislature so directed); *Hoover v. City of Albuquerque*, 58 N.M. 250, 270 P.2d 386 (1954) (statute of limitations for actions against city upheld because sufficient time had been allowed bondholders to pursue their remedies). In one case the Court seems to have recognized that the legislation did affect a contract, but upheld it as a legitimate exercise of a municipality's police power. *Temple Baptist Church, Inc. v. City of Albuquerque*, 98 N.M. 138, 646 P.2d 565 (1982) (sign ordinance requiring removal of signs maintained by party with preexisting contract held legitimate exercise of police power). Again, except for the "police power" rationale, in none of these cases was there any particular evaluation of the reasons why the legislation did or did not withstand the Contract Clause challenge.

■ We see no reason why this evaluation should be performed using a different approach than that employed by the United States Supreme Court in federal Contract Clauses cases. It is true, as we have noted, that one of the considerations in some of those cases—federal-court deference to state legislation rooted in principles of federalism—will be absent when this or another state court applies our state Constitution to state legislation, and perhaps in that situation the "height of the hurdle" to be cleared by the state law may be somewhat greater than when the law is assessed by a federal court in light of the federal Constitution. But we make no such ruling in this case; we merely hold that federal Contract Clause jurisprudence will, in general, be applicable in determining whether a particular state law violates the Contract Clause of our state Constitution.

So determining, we reach the same holding here under Article II, Section 19, of the New Mexico Constitution as we did in Part IV(A) above concerning the federal Constitution. That is, the prohibition on enforcement of a prepayment penalty in Section 48-7-19(A) is sufficiently justified by the significant and legitimate public purpose of promoting the alienability of land to withstand challenge under that clause of our Constitution.

The judgment of the district court is therefore affirmed.

IT IS SO ORDERED.

SOSA, C.J., and BACA, J., concur.