910 P.2d 288

George PIERCE, William O. Jordan, Virginia A. Jordan, Estell J. Allen, Orval Hughes, Edith Hughes, Robert L. Moore, Virginia I. Moore, Drew Cloud, Bobbie J. Cloud, Leon Karelitz, James L. Sutton, and Claretta Sutton, Plaintiffs–Appellants,

v.

STATE of New Mexico, State of New Mexico, Through its Agency, The New Mexico Taxation and Revenue Department, Defendants–Appellees.

No. 22264.

Supreme Court of New Mexico.

Dec. 11, 1995.

214

James F. Hart, Robert Brack, P.A., Robert Brack, Lisa Conly Cronin, Clovis, for Appellants.

Tom Udall, Attorney General, Frank D. Katz, Bruce J. Fort, Assistant Attorneys General, Santa Fe, for Appellees.

## OPINION

BACA, Chief Justice.

1. This is an appeal from a summary judgment entered in favor of Appellee State of New Mexico, Department of Taxation and Revenue, dismissing a class action lawsuit filed on behalf of two classes of retirees. Class A Appellants are those persons who received a pension prior to January 1, 1990, under the Public Employees Retirement Act (PERA), NMSA 1978, §§ 10–11–1 to –141 (Repl.Pamp.1992 & Cum.Supp.1994), the Judicial Retirement Act (JRA), NMSA 1978, §§ 10–12B–1 to –17 (Repl.Pamp.1992 & Cum. Supp.1994), the Magistrate Retirement Act (MRA), NMSA 1978, §§ 10–12C–1 to –16 (Repl.Pamp.1992 & Cum.Supp.1992), and the Educational Retirement Act (ERA), NMSA 1978, §§ 22–11–1 to –52 (Repl.Pamp.1993). Class B Appellants are those persons who received a pension prior to January 1, 1990, as a result of employment by the U.S. Armed Forces or the Federal Civil Service system. The court took under advisement whether Class B Appellants would be allowed to intervene in the action. Therefore, we do not address the claims of Class B Appellants.

2. Prior to March 1, 1990, retirement benefits paid to state retirees under each of the four Acts listed above were tax exempt. Retirement benefits paid to federal retirees were not tax exempt, however. The United States Supreme Court, in *Davis v. Michigan Department of Treasury,* 489 U.S. 803, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989), found this disparate treatment of federal retirees was violative of the intergovernmental tax immunity doctrine and 4 U.S.C. § 111 (1994) (prohibiting discriminatory tax treatment of federal employees). The New Mexico legislature, addressing the violation of the intergovernmental tax immunity doctrine, passed Senate Bill 310, S 310, 39th Leg., 2d Sess., 1990 N.M.Laws, ch. 49, repealing the long-standing tax exemptions for state retirement benefits. Class A Appellants filed this class-action lawsuit alleging, among other things, an unconstitutional impairment of contract. We address four issues on appeal: (1) Whether Class A Appellants had a contractual relationship with Appellee and, if so, whether the repeal of the tax exemption provisions resulted in either a breach or unconstitutional impairment of contract, (2) whether the court erred in admitting certain exhibits, (3) whether the title to SB 310 was constitutionally defective, and (4) whether the court erred in awarding Appellee its costs. We review this case pursuant to SCRA 1986, 12–102(A)(1) (Repl.Pamp.1992) (count sounding in contract), and affirm in part and reverse in part.

I

3. The material facts of this appeal are not contested. Beginning in 1990, Class A Appellants paid state income tax on retirement benefits received by them pursuant to the PERA, JRA, MRA, and ERA. Class A Appellants timely filed amended tax returns seeking refunds on the amounts paid on state retirement benefits in 1990, 1991, 1992, and 1993. Appellee denied all refund claims based upon its position that "even if the statutory provisions governing the various state retirement acts were considered a contract creating vested rights to certain benefits binding on all future legislatures," the legislature was obligated under *Davis* only to provide reasonable alternative benefits which it did by dedicating all revenue from taxing benefits to a retiree health fund.

4. Appellants brought a claim against Appellee, alleging breach of employment con-

tract and unconstitutional impairment of contract. The court denied Appellants' motion for summary judgment but granted Appellee's motion for summary judgment. The court determined that the statutory tax exemption did not create a contractual right and even if it did, the repeal of the tax exemption did not result in an impairment of the right because of the offsetting benefits provided under the Retiree's Health Care Act. The court took under advisement Appellants' motion to strike certain exhibits attached to Appellee's motion for summary judgment. The court awarded Appellee its costs. This appeal followed.

## II

5. Appellants seek reversal of the summary judgment entered in favor of Appellee. While we recognize that every Justice of this Court may have a remote pecuniary interest in the JRA retirement plan, we review this case under the rule of necessity. *See State ex rel. Bardacke v. Welsh*, 102 N.M. 592, 605, 698 P.2d 462, 475 (Ct.App. 1985); *see also Evans v. Gore*, 253 U.S. 245, 247–48, 40 S.Ct. 550, 550–51, 64 L.Ed. 887 (1920) (deciding whether Congress could tax compensation of federal judges). In reviewing the lower court's grant of summary judgment, we recognize that a party is entitled to summary judgment as a matter of law where there are no genuine issues of material fact. *See Tiguex Oil Co. v. Nassar*, 99 N.M. 134, 135, 654 P.2d 1034, 1035 (1982). However, summary judgment should be granted with utmost care to avoid depriving a party of the right to a trial on the merits. *Id.*

6. Neither party disputes that New Mexico's prior tax treatment impermissibly discriminated against federal retirees based on the source of the income, in direct contravention of *Davis*. *See Davis*, 489 U.S. at 817, 109 S.Ct. at 1508–09. In *Davis*, the United States Supreme Court found Michigan's taxation scheme to be violative of 4 U.S.C.

§ 111, and the intergovernmental tax immunity doctrine based on the fact that it exempted all state retirement benefits while taxing the retirement benefits of all other citizens, including federal retirees. *Davis*, 489 U.S. at 817, 109 S.Ct. at 1508–09. The Supreme Court held that "the retention of immunity in § 111 is coextensive with the prohibition against discriminatory taxes embodied in the modern constitutional doctrine of intergovernmental tax immunity." *Id.* at 813, 109 S.Ct. at 1506–07. Any discriminatory scheme must, therefore, be based on "significant differences between the two classes." *Id.* at 816, 109 S.Ct. at 1508 (quoting *Phillips Chemical Co. v. Dumas Indep. Sch. Dist.*, 361 U.S. 376, 383, 80 S.Ct. 474, 479, 4 L.Ed.2d 384 (1960)). The Court noted that if significant differences justify disparate treatment, then any discrimination would be based on some criteria other than "the source of those benefits." *Id.* at 817, 109 S.Ct. at 1508.

7. Because Michigan had conceded that refunds were "appropriate in these circumstances," the Court found appellant was entitled to a refund. *Id.* The Court declined to offer appellant prospective relief based on its recognition that "in cases involving invalid classifications in the distribution of government benefits, . . . the appropriate remedy 'is a *mandate* of equal treatment, a result that can be accomplished by withdrawal of benefits from the favored class as well as by extension of benefits to the excluded class.' " *Id.* at 817–18, 109 S.Ct. at 1509. (quoting *Heckler v. Mathews*, 465 U.S. 728, 740, 104 S.Ct. 1387, 1395–96, 79 L.Ed.2d 646 (1984)). The Court recognized that Michigan courts are best able to determine "how to comply with the mandate of equal treatment." *Id.* at 818, 109 S.Ct. at 1509.

8. When *Davis* was decided, roughly half of the states taxed state, federal, and military pensioners differently.[1] These

1. In addition to Michigan and New Mexico, we note that 22 other states have addressed discriminatory tax exemption provisions: Alabama, Arizona, Arkansas, Colorado, Georgia, Iowa, Kansas, Kentucky, Maryland, Massachusetts, Mississippi, Missouri, Montana, New York, North Carolina, Oklahoma, Oregon, South Car-

olina, Utah, Virginia, West Virginia, and Wisconsin. In addition, Maine, Rhode Island, and Ohio discussed the effect of a repeal of a statutory tax exemption for retirees before the *Davis* decision. Although we find no case law, Louisiana recently revised its state retirement plan but appears to have retained the disparate tax exemption

states have employed various methods to remedy the violation of the intergovernmental tax immunity doctrine, ranging from exemptions for all state, federal, and military retirees to partial exemptions, to taxation of all retirees. The New Mexico legislature, in determining how to "comply with the mandate of equal treatment," *see Davis*, 489 U.S. at 818, 109 S.Ct. at 1509, chose to tax all benefits equally. This is a public policy decision, and we defer to the wisdom of the legislature. *State ex rel. Hudgins v. Public Employees Retirement Bd.*, 58 N.M. 543, 548, 273 P.2d 743, 746–47 (1954) (agreeing that choice of rate at which employees would be required to contribute to retirement plan was within legislature's discretion).

9. Most important to the question before us are those states in which the legislature elected to tax all retirees equally. The decision to tax all retirees raises the question of whether the repeal of a statutory tax exemption results in an impairment or breach of contract. We find eight states that have encountered this issue.[2] Ohio found that its legislature had granted public employees and state teachers a vested right to receive benefits, but it had not granted them "a vested right to receive their pensions exempt from tax." *See Herrick v. Lindley*, 59 Ohio St.2d 22, 28, 391 N.E.2d 729, 732–33 (1979). Georgia, *see Parrish v. Employees' Retirement Sys.*, 260 Ga. 613, 398 S.E.2d 353, 354 (1990), *cert. denied*, 500 U.S. 918, 111 S.Ct. 2016, 114 L.Ed.2d 103 (1991), and Oregon, *see Hughes v. State*, 314 Or. 1, 838 P.2d 1018 (1992) (in banc), found the retirement plans created contractual rights and the tax exemption provisions were part of the contracts. Neither state, however, found an unconstitutional impairment of contract resulting from the re-

peal of the tax exemption provisions. Georgia based its finding on the fact that the statutory provision provided an irrevocable tax exemption and thus violated the Georgia constitution. *See Parrish*, 398 S.E.2d at 355. On the other hand, Oregon, like New Mexico, has no prohibition against granting an irrevocable tax exemption. *See Hughes*, 838 P.2d at 1025.

10. Appellants urge us to follow the reasoning in *Hughes*. In *Hughes* the legislature had repealed the tax exemption provisions contained in both the Public Employes' [sic] Retirement System (PERS) and the general tax code. The tax exemption provision contained in Oregon's PERS read:

> The right of a person to a pension, ... or any other right accrued or accruing to any person under the provisions of ORS 237.001 to 237.315, ... shall be exempt from all state, county and municipal taxes heretofore or hereafter imposed, shall not be subject to execution, garnishment, attachment or any other process or the operation of any bankruptcy or insolvency law heretofore or hereafter existing or enacted, and shall be unassignable.

*See* Ore.Rev.Stat. § 237.201 (1969).

11. Oregon relied on prior state law that had found "PERS is a contract between the state and its employees." *Hughes*, 838 P.2d at 1027. The court determined that the tax exemption provision was part of the contract. *Id.* at 1030. The Oregon court noted that the tax exemption applied only to benefits that had "accrued or are accruing." *Id.* at 1034. Therefore, the tax exemption provision for future, "unaccrued" benefits could be repealed, whereas a repeal of the tax exemp-

provisions. *See* La.Rev.Stat.Ann. §§ 11:405, :570, :930, :1331(B) (West 1993).

2. Colorado, Georgia, Maine, Montana, North Carolina, Ohio, Oregon, and Rhode Island. Maine, Ohio, and Rhode Island considered the question before the *Davis* decision. North Carolina dismissed the claim based on the failure of the retirees to properly follow statutorily mandated refund procedures. *See Bailey v. State*, 330 N.C. 227, 412 S.E.2d 295, 300–03 (1991), *cert. denied*, 504 U.S. 911, 112 S.Ct. 1942, 118 L.Ed.2d 547 (1992). Both Maine, *see Blair v. State Tax Assessor*, 485 A.2d 957, 960 (Me.1984),

and Rhode Island, *see Linnane v. Clark*, 557 A.2d 477, 477, 479–80 (R.I.1989), found the exemptions were repealed by implication following extensive revisions of their general tax codes. Colorado found that the exemption was not contractual where it was contained only in the general tax code. *See Spradling v. Colorado Dep't of Revenue*, 870 P.2d 521, 524 (Colo.Ct.App.1993), *cert. denied*, Apr. 4, 1994. Montana found no contract based on the use of the present tense, "are," and its constitutional prohibition against granting an irrevocable tax exemption. *See Sheehy v. Public Employees Retirement Div.*, 262 Mont. 129, 864 P.2d 762, 765–76 (1993).

tion for "accrued or accruing" benefits would result in an unconstitutional impairment of contract. *Id.*

12. However, the Oregon court did not stop there. The general tax code contained an identical tax exemption provision. The court determined that the tax code provision was "only a mirror of the obligation ... not the obligation itself," *id.*, 838 P.2d at 1036, and its repeal would only result in a breach of the PERS contract, for which the legislature could devise a remedy, *id.* at 1036 n. 36. Because the state remained obligated under the PERS contract to provide a tax exemption for accrued or accruing benefits, there was no impairment of contract. Like the court in Colorado, *see Spradling v. Colorado Dep't of Revenue*, 870 P.2d 521, 524 (Colo.Ct. App.1993), *cert. denied*, Apr. 4, 1994, the *Hughes* court found that an exemption under a general tax code does not create a contractual obligation, *Hughes* at 1036.

13. We do not find the analysis of the Contract Clause in *Hughes* helpful based on the fact that "we prefer to apply more modern Contract Clause analysis," *Los Quatros, Inc. v. State Farm Life Ins. Co.*, 110 N.M. 750, 757, 800 P.2d 184, 191 (1990), than that used by the Supreme Court during the nineteenth century, which *Hughes* relied on, *cf. Hughes*, 838 P.2d at 1024. We have determined that modern "federal Contract Clause jurisprudence will, in general, be applicable in determining whether a particular state law violates the Contract Clause of our state Constitution." *Los Quatros*, 110 N.M. at 760, 800 P.2d at 194.

14. As a result, we find more persuasive Justice Peterson's dissent in *Hughes*, arguing that neither the Oregon PERS nor general tax code provision constituted an irrevocable tax exemption because of the higher standard required to find that a state has surrendered its sovereign power of taxation. *Hughes*, 838 P.2d at 1058. "[T]he [Supreme] Court has applied a strict rule of construction against finding an irrepealable tax exemption. No decision of the Supreme Court of the United States in the last 100 years has upheld an irrepealable tax exemption." *Id.*

at 1051 (citations omitted). Justice Peterson further states that

> [a]lthough the use of the mandatory 'shall' is indicative of the strength of the legislature's intent ... the language of section 23, the exemption provision, does not *clearly and unambiguously* express an intention not to allow repeal or amendment.... The placement of the exemption in section 23 among other provisions that have little or nothing to do with monetary benefits that might be the subject of a contract suggests that the exemption was not intended to be contractual.

*Id.* at 1054 (emphasis added). Justice Peterson stated that while the "express language of the statute is crystal clear, insofar as the income tax exemption itself is concerned.... it is anything but clear that the legislature intended to bind the hands of future legislatures in such a substantial way." *Id.* at 1058. The critical question is whether the legislature intended to foreclose future legislatures from taxing PERS benefits. *Id.*

15. Our tax exemption provision is likewise contained in a section that has little or nothing to do with monetary benefits for the retirees. As discussed below, the tax exemption provisions are all contained within freedom from service of process provisions and have been modified as public policy has changed.

16. We also find persuasive the reasoning in *Herrick v. Lindley*, at 25–28, 391 N.E.2d at 732–33. Based on statutory interpretation, the Ohio court found that the "retirees have a vested right to receive a retirement allowance or similar benefit at the rate fixed by law when such benefit was conferred. However, neither [statute] grants a vested right to a continuing tax exemption." *Id.* The court noted that while the end results may be the same whether the pension is reduced or taxed, "there is a definite legal distinction between reducing the rate of a pension and levying a tax upon the income received from that pension. The vesting statutes prohibit only a reduction in the rate of payment. They do not prohibit the imposition of a tax." *Id.* at 27, 391 N.E.2d at 733. The court added that "every reasonable

doubt should be resolved against" finding the legislature had granted a vested right to a tax exemption because the legislature "partially relinquishes its ability to deal with changing fiscal conditions in the future. The power to tax being a fundamental governmental power, its impairment should not be based upon a debatable construction of statutory language." *Id.* Although Ohio's statutory provision was stated in the present tense,[3] the court did not rely on or mention this fact in reaching its conclusion. *Id.* at 23–25, 391 N.E.2d at 731.

### III

17. Our first inquiry in determining whether Appellants had a contractual relationship with Appellee is whether the four retirement programs create either contractual or vested rights. *See Whitely v. New Mexico State Personnel Bd.,* 115 N.M. 308, 312, 850 P.2d 1011, 1015 (1993) (stating that prerequisite to any contract claim is proof of existence of contract). If we find that the plans confer either, then we ascertain whether the tax exemptions were included within those rights. Our first task is to examine carefully the language of each statutory plan. Statutory language conferring vested rights does not necessarily confer contractual rights. Rather, contractual rights may create a vested right.

> [Vesting] is substantially a property right, and may be created either by common law, by statute, or by contract. And when it has been once created, and has become absolute, it is protected from the invasion of the Legislature by those provisions in the Constitution which apply to such rights. And a failure to exercise a vested right before the passage of a subsequent statute, which seeks to divest it, in no way affects or lessens that right.

*Rubalcava v. Garst,* 53 N.M. 295, 298, 206 P.2d 1154, 1156 (1949) (quoting *Baker v. Tulsa Building & Loan Ass'n,* 179 Okla. 432, 66 P.2d 45, 46 (1936).) We have defined vested rights as "the power to do certain actions or possess certain things lawfully." *Id.* This is

not synonymous with contractual rights. We will find that a statute confers contractual rights when the language expressly so states, or the statute by clear and unambiguous terms indicates that the State specifically entered into a bargain with a party "in fact as found in their language or by implication from other circumstances, as affected by rules of law." 1 Arthur L. Corbin, Corbin on Contracts § 1.3, at 9 (rev. ed. 1993). We will not imply "a legislative intent to create private rights of a contractual nature enforceable against the State." *Whitely,* 115 N.M. at 312, 850 P.2d at 1015.

18. In order to find that the tax exemptions were contractual or vested, we must first find that the legislature clearly and unambiguously intended to create either contractual or vested rights to receive pensions benefits from the retirement programs themselves. *Id.; Hughes,* 838 P.2d at 1054 (J. Peterson, dissenting) (statutory language must clearly and unambiguously preclude amendment or repeal); *United States Trust v. New Jersey,* 431 U.S. 1, 17 n. 14, 97 S.Ct. 1505, 1515 n. 14, 52 L.Ed.2d 92 (1976) (statutes do not create private contractual rights unless language and circumstances clearly indicate otherwise).

19. Appellants assert that there is no issue that the four retirement programs are contractual agreements between the state and the retirees, relying on *State ex rel. Sena v. Trujillo,* 46 N.M. 361, 367, 129 P.2d 329, 332 (1942). Appellants also contend that Appellee has conceded such a contractual relationship. However, the nature of the statutory retirement plans presents a legal question for the Court to resolve. *See Vigil v. American Ins. Union,* 37 N.M. 44, 47, 17 P.2d 936, 938 (1932) (Court need not acquiesce in erroneous statutory construction).

### A

20. In construing the nature of these four statutory pension plans, we briefly look at the evolution of public pensions. Next, we consider how other jurisdictions have inter-

---

**3.** The relevant sections of both Ohio Rev.Code Ann. § 145.56 (Baldwin 1994) and 3307.71 (Baldwin 1995) read: "The right of a person to a

pension, an annuity, or retirement allowance itself ... and all moneys and investments and income thereof, are exempt from any state tax."

preted their retirement plans. Then we examine our own statutes. Finally, we examine our prior rulings that have addressed any of the retirement programs.

21. In the late eighteenth century "[t]he unquestioned rule [was] that a pension granted by the public authorities [was] not a contractual obligation, but a gratuitous allowance, in the continuance of which the pensioner has no vested right." Annotation, *Vested Right of Pensioner to Pension*, 54 A.L.R. 943, 943 (1928). Furthermore, "the notion that public employees had enforceable pension claims arising out of their employment would have grated harshly on the minds and ears of a nation decades removed from current and acceptable philosophies of governmental labor relations." Rubin G. Cohn, *Public Employee Retirement Plans— the Nature of the Employees' Rights*, 1968 U.Ill.L.F. 32, 35–36. This view is exemplified in *Pennie v. Reis*, 132 U.S. 464, 470–72, 10 S.Ct. 149, 151, 33 L.Ed. 426 (1889) (because state retained contribution from employee's salary and deposited money directly into retirement program, employee had no property interest in benefits).

22. A contrary view was introduced in 1904 when the New Jersey Supreme Court found that an amendment to a teacher's retirement plan created a contractual relationship. *Ball v. Board of Trustees*, 71 N.J.L. 64, 58 A. 111 (1904).[4] The court based its decision on the fact that participation was voluntary and the terms of the relationship were specified in the statute. *Id.*, 58 A. at 111–12.

23. These two views "have influenced the decisional law of pension rights to the present time. With few exceptions, and with an extraordinary demonstration of reverence for these first precedents, state courts continue their reliance on the main premises of these decisions." Cohn, *supra*, at 37. The test frequently used to determine "the legal nature of the employees' interest" is whether the plan features mandatory or voluntary participation; voluntary participation creates contractual rights and mandatory participation a gratuity. *Id.*

24. Under the voluntary/mandatory test, those employees who initially elected to participate in the pension plan would have contractual rights while employees hired after the enactment of mandatory participation provisions would have only "an expectancy." Cohn, *supra*, at 42. Many state retirement programs were enacted as voluntary plans for those currently employed but were compulsory for new employees. *Id.*, see NMSA 1941, § 3–1602 (Cum.Supp.1947). For example, in *State ex rel. Public Employees Retirement Bd. v. Mechem*, 58 N.M. 495, 273 P.2d 361 (1954), we acknowledged that under the statutory provisions in effect at the time, an educational employee could voluntarily belong to PERA in addition to the mandatory Teachers Retirement Association (TRA), the predecessor of ERA. *Id.* at 503, 273 P.2d at 365. Using the voluntary/mandatory test, the employee voluntarily joining PERA would have a contractual right to PERA benefits but only an expectancy in the TRA benefits. In addition, because PERA membership was optional for current employees and mandatory for all new state employees when enacted in 1947, *see* § 3–1602, existing employees would have a contractual right to benefits whereas new employees would only have an expectancy. Thus, under the voluntary/mandatory test, similarly situated employees under PERA would have significantly different rights. The absurdity of using the voluntary/mandatory test is self-evident, and we abandon it.

25. The modern trend generally agrees that the voluntary/mandatory test is archaic and inappropriate, *see Pineman v. Oechslin*, 195 Conn. 405, 488 A.2d 803, 808 (1985), *cert. denied*, 488 U.S. 824 (1988), especially because most state pension programs are contributory. *See* R.D. Hursh, Annotation, *Vested Right of Pensioner to Pension*, 52 A.L.R.2d 437, 442 (1957).

26. A few states have passed constitutional amendments protecting the contractual right of public employees to receive accrued pension benefits according to the terms un-

---

4. It is interesting to note that New Jersey has turned away from this contractual concept. *See*

*Spina v. Consolidated Police & Firemen's Pension Fund Comm'n*, 41 N.J. 391, 197 A.2d 169 (1964).

**222**

der which they accrued.[5] Others find a contractual right to receive pension benefits based on vesting language in their statutory retirement plans or by implication.[6]

27. The courts in Connecticut,[7] Maine,[8] Minnesota,[9] New Jersey,[10] and Rhode Island[11] have found expressly that statutory retirement plans do not create contractual rights. These states recognize that pensioners acquire an important property interest or right, but decline to find in the language of the statute a legislative intent to create a contract.

28. Connecticut has recognized a vested right to receive pension benefits created by statute, which accrues once a retiree satisfies the requirements for eligibility. *See Pineman v. Oechslin*, 488 A.2d at 810. This statutory right is protected "from arbitrary legislative action under the due process provisions of [the] state and federal constitutions." *Id.* The court reasoned that finding a contract where there is no clear legislative intent to create one, and then finding that the contract can be unilaterally modified,

> conflicts with basic contract law and contract clause analysis. It makes little sense to strain established rules of statutory interpretation to find a contract where the requisite express legislative intent is lacking, only to strain other equally well settled legal principles to allow for necessary unilateral modification by the state.

*Id.* at 809. The court also found the promissory estoppel approach inadequate because

> [it] ignores the distinction traditionally made between private and public entities in determining the existence of contractual rights and obligations. "[C]ourts have consistently refused to give effect to government-fostered expectations that, had they arisen in the private sector, might well have formed the basis for a contract or an estoppel." This distinction can be viewed as another way of articulating the requirement of an express legislative intent to contract. *When the legislature intends to surrender its power of amendment and revision by creating a contract and thereby binding future legislatures, it must declare that intention in clear and unambiguous terms.* A relinquishment of this authority should not occur by legislative inadvertence or judicial implication. To hold otherwise "requires the legislature and pension fund administrators to walk a tight rope whenever changes are indicated, and to accept risks which may turn into substantial financial obligations years after the fact."

---

5. *See, e.g.*, Alaska Const. art. XII, § 7 (accrued benefits protected as contractual rights); Hawaii Const. art. XVI, § 2 (same); Ill. Const. art. 13, § 5 (membership enforceable as contractual right); Mich. Const. art. IX, § 24 (accrued financial benefits create contractual obligation); N.Y. Const. art. V, § 7 (membership creates contractual relationship).

6. States finding contractual rights to retirement benefits then must address the need of legislatures to modify the statutory retirement plans. Three states, Arizona, Georgia, and Pennsylvania, follow a strict contract theory that precludes modification of the retirement plan. Other states follow either the "California Rule," permitting broad flexibility provided any reduction of benefits is offset by equal or greater advantages, or the "Pennsylvania Rule" (now abandoned by Pennsylvania), permitting only modifications that enhance the actuarial soundness of the retirement fund.

7. *Pineman v. Oechslin*, 195 Conn. 405, 488 A.2d 803, 808 (1985) (discussed below), *cert. denied*, 488 U.S. 824, 109 S.Ct. 72, 102 L.Ed.2d 48 (1988).

8. *Spiller v. State*, 627 A.2d 513, 516–17 & n. 12 (Me.1993) (declining to imply contractual rights where no intent expressed in statutory language; retirement program merely reflection of public policy although state employees have "legitimate retirement expectations" entitling them to due process).

9. *Christensen v. Minneapolis Mun. Employees Retirement Bd.*, 331 N.W.2d 740, 746–48 (Minn. 1983) (holding that promissory estoppel precludes arbitrary changes to retirement plan; however, public interests of state in modifying pension plan may be superior to employees' entitlement rights).

10. *Spina v. Consolidated Police & Firemen's Pension Fund Comm'n*, 41 N.J. 391, 197 A.2d 169, 176 (1964) (discussed below).

11. *In re Almeida*, 611 A.2d 1375, 1384 (R.I.1992) (declining to categorize pensions but recognizing pension comprises elements of both deferred compensation and contract theories).

*Id.* (emphasis added) (citation omitted) (quoting *Kizas v. Webster,* 707 F.2d 524, 535 (D.C.Cir.1983) & Rubin G. Cohn, *Public Employee Retirement Plans—the Nature of Employees' Rights,* 1968 U.Ill.L.F. 32, 48).

■ 29. Similarly, New Jersey has reasoned that mandatory retirement programs create neither contractual nor vested rights but possibly property rights in the retirement fund. *See Spina v. Consolidated Police & Firemen's Pension Fund Comm'n,* 41 N.J. 391, 197 A.2d 169, 175–76 (1964). The New Jersey court held that pension benefits were not a gratuity within its constitutional ban on public donations.[12] *Id.,* 197 A.2d at 175. The court declined to find contractual rights because the retirement fund, to be a contract, must guarantee the solvency of the fund so that "the expectations of all of the rank-and-file members" are met. *Id.* The recognition of the legislature's potential need to unilaterally intervene to preserve the actuarial soundness of the retirement fund precludes implying a contractual obligation. *Id.* at 176. "[I]t seems odd to say the State may unilaterally rewrite its own contract. . . . We think it more accurate to acknowledge the inadequacy of the contractual concept." *Id.*

■ 30. With this background, we look at the language and circumstances of our four statutory retirement systems. As we begin, we reiterate that the tax exemption provisions were all contained within the freedom from service of process provisions in each plan. We are mindful that while the federal courts have the ultimate authority to determine whether a contract is protected from impairment by the federal contract clause, we are the final arbiters of whether a particular statute creates a contractual obligation under our state law. *See Pineman v. Oechslin,* 637 F.2d 601, 604–05 (2d Cir.1981) (finding state autonomy and principles of federalism would be impaired were federal courts to determine whether state intended to convey contractual rights to pensions). We will find a contract only where the language is clear and unambiguous, and we will resolve any uncertainty in favor of finding no contract.

**B**

31. For the sake of brevity, we review our four retirement programs together while recognizing that the language in each is somewhat different. We have examined carefully all four plans for any language that clearly and unambiguously create contractual rights. We have also examined the plans to determine whether the statutes confer any other rights to retirees and specifically whether the statutes confer rights to the tax exemptions. As discussed more fully below, we find no express language that clearly and unambiguously creates private contractual rights. However, because we find that three of the four plans expressly granted vested rights and that all four plans confer an absolute right to receive benefits upon accumulation of the requirements of the plans, we imply in all four plans a statutorily created property interest in receiving benefits. This interest vests upon fulfilling the minimum five years of service credits. This vested property right matures when the employee attains the age specified in the plan.

32. In 1947 the New Mexico Legislature enacted PERA. *See* NMSA 1941, § 3–1601 to –1628 (Cum.Supp.1947). JRA was included within the overall PERA retirement scheme. Sections 3–1624 to –1627. PERA membership was optional for employees existing when it was enacted but mandatory for all new public employees. *See* NMSA 1941, § 3–1602. Until the MRA was enacted in 1984, *see* NMSA 1978, § 10–12A–2(M) (Cum. Supp.1986), magistrate judges could elect to join PERA. When originally enacted, PERA stated that "nothing done hereunder shall create any contract rights to anyone, except the right to receive back accumulated deductions upon withdrawings from the public service." Section 3–1605. The retirement board was granted authority to modify the "provisions for the management of the fund and affairs of the association . . . except that no increase may be made in the amount of

---

12. We likewise reject the argument that statutorily conferred pension benefits are a gratuity within our constitutional prohibition on public donations. *See* N.M. Const. art. IV, §§ 27, 31; art. IX, § 14.

deductions from salaries or a decrease in the amount of retirement annuities payable, unless such action is approved by a majority vote of an annual or special meeting of the association." Section 3–1623. PERA also included a tax exemption in the freedom from process provision that stated "the monies, annuities or other benefits mentioned in this act ... shall be exempt from any state income tax." Section 3–1619.

33. It is apparent from the plain language used that the original legislative intent of PERA was to preclude creating general contractual rights to benefits. It is equally apparent that the PERA retirement board expressly retained the power to modify the amount of employee contributions or the amount of benefits payable. That the legislature granted the board the right to modify benefits and payments is contrary to any intent to confer private contractual rights.

34. ERA was established in 1967 when the Teachers' Retirement Act (TRA) was repealed. See NMSA 1953, Repl.Vol. 11, pt. 1 (1968) §§ 77–9–1 to –45. TRA was originally enacted in 1933, see 1933 N.M.Laws ch. 106, § 1, and reenacted in 1937, see NMSA 1929, §§ 120–1112 to –1116 (1938). The ERA retirement board was authorized to "adopt regulations pursuant to the Educational Retirement Act." NMSA 1953, Repl.Vol. 11, pt. 1 (1968), § 77–9–6(E). The program was mandatory for regular members, although voluntary for provisional members. See §§ 77–9–16, –17, –2(B) & (H). ERA also included a provision precluding service of process and exempting "any state income tax" on "contributions or benefits." See § 77–9–42. This provision was amended in 1987 in recognition of the community property nature of the benefits, see NMSA 1978, § 22–11–42 (Cum.Supp.1987), and in 1989 to permit service of process for child support obligations, see NMSA 1978, § 22–11–42 (Repl.Pamp.1989). ERA has never expressly granted either contractual or vested rights.

35. The first mention of creating any absolute right to receive benefits occurred in the 1971 amendment to JRA. The 1971 amendment stated that the JRA retirement allowance was "vested" upon meeting the required minimum age and years of earned service credits. See NMSA 1953, § 5–5–24 (Supp.1971); NMSA 1978, § 10–12–1(A) (Repl.Pamp.1990). JRA was separated from PERA when the legislature revised the statutes in 1978 and contained no provision that precluded service of process against the benefits or that granted a tax exemption. See NMSA 1978, §§ 10–12–1 to –15.

36. When MRA was enacted in 1984, it expressly created vested rights to benefits. The statute defined a "vested annuity" as the annual benefits a retiree would receive based on the salary during the last year prior to retirement and the total years of service. See § 10–12A–2(M) (Cum.Supp.1986). The retirement board was granted broad authority to promulgate rules and regulations. See § 10–12A–3(A). The MRA included a provision precluding service of process and exempting from "any state income tax" the "money, annuities or other benefits." See NMSA 1978, § 10–12A–12 (Repl.Pamp.1987).

37. The only other mention of vested rights occurred in 1987 when PERA was reenacted. This new provision granted employees with five or more years of credited service a vested right in membership upon termination of employment provided the employees did not withdraw their individual contributions. See § 10–11–9 (Repl. Pamp.1987). The reenactment modified the freedom from service of process provision, recognizing that PERA benefits are community property. See NMSA 1978, § 10–11–136. In 1989 the PERA freedom from process provision was again modified to permit service of process for child support obligations. See NMSA 1978, § 10–11–136.1 (Cum.Supp.1989); § 10–12–18. JRA was also amended in 1989 by adding a freedom from process provision that recognized benefits were community property and stating that "pensions or other benefits ... shall be exempt from state income tax." Thus, JRA was comparable to the other state retirement plans.

38. All four plans were amended in 1990 when the tax exemptions contained in the freedom from process provisions were repealed. Amendments in 1992 repealed the

vesting language in both JRA and MRA.[13] The 1992 amendment to JRA also permitted service of process for child support obligations. *See* § 10–12B–7 (Repl.Pamp.1992). Thus all four plans recognize the community property nature of retirement benefits and permit service of process for child support. Only PERA retains any mention of vested rights. *See* § 10–11–9.

39. We have thoroughly examined the language of the original versions of the acts and the various amendments. Unlike *Board of County Commissioners v. New Mexico & Southern Pacific Railroad*, 3 N.M. 126, 135, 2 P. 376, 380–81 (1884), in which the Court found that the state's promise of a tax exemption in exchange for building and operating rail services in New Mexico constituted a unilateral contract, we find no language in any plan that clearly and unambiguously promises to grant specific retirement benefits in exchange for specific services. Rather, when enacted, PERA expressly stated that it was not granting any contractual rights except the right to withdraw individual contributions upon termination of employment. The right to receive benefits under the present plans is merely an expectancy until an employee has earned five years of service credits. Unlike some states, we have no constitutional language creating a contractual right to retirement benefits. Likewise, we find no statutory language in any of the plans that clearly and unambiguously spells out a contract between the State and its employees.

40. Appellants do not claim an express contract exists but rely on dicta in our prior decisions. Likewise, they rely on law from other jurisdictions. We recognize that "there is a seductive appeal in the contract-oriented approaches adopted by other jurisdictions." *Pineman*, 488 A.2d at 808. However, under our rules of statutory construction, "[c]ontractual rights are not created by statute unless 'the language of the statute and the circumstances ... manifest a legislative intent to create private rights of a contractual nature enforceable against the

State.'" *Whitely*, 115 N.M. at 312, 850 P.2d at 1015 (quoting *Wage Appeal v. Board of Personnel Appeals*, 208 Mont. 33, 676 P.2d 194, 199 (1984)). There is no clear and unambiguous legislative intent in any of the four plans to create private contractual rights.

41. If the right to receive retirement benefits was conferred by a private rather than a public employer, we would imply contractual rights. *See Ruggles v. Ruggles*, 114 N.M. 63, 70, 834 P.2d 940, 947 (Ct.App.1992) (agreeing that right to collect pension from private employer is contract right). However, there is a "distinction traditionally made between private and public entities in determining the existence of contractual rights and obligations." *Pineman*, 488 A.2d at 809. We decline to imply private contractual rights enforceable against the State. *Whitely*, 115 N.M. at 312, 850 P.2d at 1015. To do so would play "havoc with basic principles of contract law, traditional contract clause analysis and, most importantly, the fundamental legislative prerogative to reserve to itself the implicit power of statutory amendment and modification." *Pineman*, 488 A.2d at 808.

42. We do find that all four retirement plans grant employees a substantive right to receive retirement benefits upon meeting certain requirements. PERA, JRA, and MRA have expressly acknowledged that rights to receive benefits vest upon fulfilling the terms of the plans, although the vesting language has now been withdrawn from JRA and MRA. Furthermore, in all four retirement programs, the language of the statutes confers an absolute right to receive some form of retirement benefits upon fulfilling the requirements of the plan. This statutorily granted power "to do certain actions or possess certain things lawfully" confers a vested right. *See Rubalcava*, 53 N.M. at 298, 206 P.2d at 1156.

43. Therefore, we find that the express language of the statutes initially creates an expectancy, or property interest, in receiving benefits. *Cf. Board of Regents v. Roth*, 408

**13.** We express no opinion as to the constitutionality of the withdrawal of vested rights because

the issue is not before the Court.

U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972) (property laws protect "legitimate claim of entitlement"). All four programs require a minimum of five years of earned service credits before an employee is eligible to receive benefits. The only other condition of eligibility is reaching a specified age. Therefore, based on an absolute right to receive some form of benefits after earning five years of service credits, we may infer that the statutes create vested property rights, but that these rights do not mature until the final statutory condition is met. *Copeland v. Copeland*, 91 N.M. 409, 412, 575 P.2d 99, 102 (1978). Although we find vested rights, we do not find contractual rights. Statutes, like contracts and the common law, may confer vested property rights. *Rubalcava*, 53 N.M. at 298, 206 P.2d at 1156.

44. The specific amount of benefits to be received are indeterminate at the time the property right vests. *Cf.* NMSA 1978, § 10–11–9(B) (Repl.Pamp.1987) (terms of vested rights determined according to provisions in effect at time of termination). The details of the vested rights are to be determined by the statutes in effect at the time of maturity. *Copeland*, 91 N.M. at 412 & n. 1, 575 P.2d at 102 & n. 1. Where the statutes are silent, we find that maturity occurs when the terms for retirement have been met. *Id.* The legislature may choose to establish a different point of maturity.

45. Having found no contractual rights to receive benefits, we need not examine the tax exemption provisions to determine whether they confer private contractual rights. However, having found that the four retirement plans create vested rights to receive benefits, we examine the tax exemption provisions to determine whether the plans include a vested right to receive the benefits free from taxation. We find no vested right to tax exemptions.

46. We agree with Appellants that the language of the statutes indicates

an intent to create tax exemptions.[14] *See Flaska v. State*, 51 N.M. 13, 24, 177 P.2d 174, 181 (1946) (legislative intent to grant exemption must be expressed in clear and unambiguous terms). We disagree that the statutes indicate a clear and unambiguous legislative intent to create irrevocable or vested tax exemptions. The power to tax is a fundamental governmental power that should not be diminished where there are other reasonable constructions of the statute. *Herrick*, 391 N.E.2d at 733. "As a general rule, if a right is based solely upon a statute, there being no such right at common law, the repeal of the statute abolishes the right, unless the repealing statute includes a saving clause or unless the right has vested." *Rodgers v. City of Loving*, 91 N.M. 306, 308, 573 P.2d 240, 242 (Ct.App. 1977).

47. Although the substantive right to receive benefits confers a property right upon vesting, the tax exemptions are not contained within the provisions defining the substantive rights of employees to receive benefits. Rather, the exemptions are included in the freedom from service of process provisions. These provisions reflect current public policy to protect retirement benefits from attachment by creditors. "Policies, unlike contracts, are inherently subject to revision and repeal, and to construe laws as contracts when the obligation is not clearly and unequivocally expressed would be to limit drastically the essential powers of a legislative body." *National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry.*, 470 U.S. 451, 466, 105 S.Ct. 1441, 1451, 84 L.Ed.2d 432 (1985). The " 'law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise.' This well-established presumption is grounded in the elementary proposition that the principal function of a legislature is not to make contracts, but to make laws that

14. We recognize that the Court of Appeals determined that contributions into the ERA retirement fund were exempt from taxation, as well as the benefits. *See Vaughn v. State Taxation & Revenue Dep't*, 98 N.M. 362, 366, 648 P.2d 820, 824 (Ct.App.1982). The Court based its decision on

the existing statutory scheme that reflected a public policy of permitting tax exemptions for retirement benefits. While valid when decided, *Vaughn* would now be incorrect because public policy has changed as reflected by the amended statutes.

establish the policy of the state." *Id.* (citations omitted).

48. A legislative intent to confer contractual or vested rights is especially suspect where the tax exemptions are included in non-substantive provisions such as the freedom from process provisions. We agree with the Attorney General that the state by granting tax exemptions was expressing its concern "that for the most part persons drawing state retirement benefits are those of advanced age whose economic situation in living on a small fixed income in a period of rising prices is already perilous." N.M.Att'y Gen.Op. 62–13 (1962) (determining that 1961 amendment of tax code did not repeal PERA tax exemption provision). We presume that statutes establish current public policy subject to legislative revision rather than creating either contractual or vested rights. *Whitely v. New Mexico State Personnel Bd.,* 115 N.M. at 312, 850 P.2d at 1015; *see also United States Trust v. New Jersey,* 431 U.S. 1, 17 n. 14, 97 S.Ct. 1505, 1515 n. 14, 52 L.Ed.2d 92 (1976) (stating that statutes do not create a private contractual right unless language and circumstances clearly indicate otherwise). In fact, all the freedom from process provisions have been modified to recognize the community property nature of retirement benefits and to provide for service of process to enforce child support obligations, reflecting changes in current public policy.

49. Therefore, after careful review, we find no clear and unambiguous intent to create either private contractual or vested rights in the tax exemptions under any of the four retirement programs. This is not inconsistent with our prior holdings.

**C**

50. Appellants argue that we have "consistently discussed the pension rights of public employees as contractual." In *State ex rel. Sena v. Trujillo,* 46 N.M. 361, 367, 129 P.2d 329, 332 (1942), we noted that the Supreme Court of California had held that "where services are rendered under the pension statute ... the pension provisions 'become a part of the contemplated compensation for those services, and so in a sense a part of the contract of employment itself.'" *Id.* (quoting *O'Dea v. Cook,* 176 Cal. 659, 169 P. 366, 367 (1917)). However, the question before the Court in *Trujillo* was whether the 1941 pension act granting $125.00 per month for all state employees who reached the age of 65 and had worked for the state for thirty consecutive years applied retroactively to a person who had left state employment ten years prior to the passage of the act. The Court did not expressly decide whether the 1941 pension system was contractual in nature but, rather, found that retroactive application of the pension in this situation violated the constitutional prohibitions against private donations and extra compensation after services were rendered. *Id.* at 369, 129 P.2d at 333; N.M. Const. art. IX, § 14; art. IV, §§ 27, 31.

51. We also have held that the 1953 enactment of PERA did not violate our constitutional prohibition against granting public employees extra compensation where retirees voluntarily made small lump-sum contributions in exchange for significant increases in benefits. *See Hudgins,* 58 N.M. at 546, 273 P.2d at 745; N.M. Const. art. IV, § 27. In *Hudgins* we cited with approval *Raines v. Board of Trustees,* 365 Ill. 610, 7 N.E.2d 489, 491 (1937), concluding that voluntary, as opposed to mandatory, contributions created a contractual relationship similar to an insurance annuity contract. *Hudgins,* 58 N.M. at 547–48, 273 P.2d at 746–47. As noted above, we now expressly reject this voluntary/mandatory test. The issues before the Court in *Hudgins* were whether the increased retirement benefits violated our constitutional bans on public donations, appropriating public money for private use, or granting extra compensation to public officers. The general nature of our four retirement programs was not before the Court.

52. We recognized a community property interest in "'vested' but 'unmatured'" public employee benefits that is now codified in all four retirement programs. *See Copeland,* 91 N.M. at 412, 575 P.2d at 102. In *Copeland* we explained that a vested right to PERA pension benefits is a property right that is "entitled to constitutional protection as for example against taking without due process

of law. . . . When the requirements of vesting have once been met, no longer may the employer unilaterally terminate, diminish or alter the vested rights." *Id.*

■ 53. In *Whitely v. New Mexico State Personnel Board,* 115 N.M. at 312, 850 P.2d at 1015, we stated that

> statutes fixing the compensation or terms of public employment are presumed merely to establish public policy subject to legislative revision, and not to create contractual or vested rights. Contractual rights are not created by statute unless *"the language of the statute and the circumstances . . . manifest a legislative intent to create private rights of a contractual nature enforceable against the State."*

*Id.* (quoting *Wage Appeal v. Board of Personnel Appeals,* 208 Mont. 33, 676 P.2d 194, 199 (1984)) (citation omitted) (emphasis added). Because we have expressly stated that employees have no contractual rights to specific compensation or terms of employment, it seems illogical to find contractual rights to retirement benefits. We will not infer "a legislative intent to create private rights of a contractual nature enforceable against the State" unless the legislative intent is clearly and unambiguously stated. *Id.*

■ 54. As we have explained in *Copeland,* public retirement plans create a property interest upon vesting that matures upon fulfilling the conditions for retirement. 91 N.M. at 412, 575 P.2d at 102. Under both the state and federal constitutions, property may not be taken without just compensation. *See* N.M. Const. art. II, § 20; U.S. Const. amend. XIV, incorporating amend. V; *see also Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 481 n. 10, 107 S.Ct. 1232, 1240 n. 10, 94 L.Ed.2d 472 (1987) (holding that Fourteenth Amendment incorporates Fifth Amendment prohibition against taking of property). Thus, any action by the legislature that serves "to terminate, diminish or alter" the value of pension benefits, *Copeland,* 91 N.M. at 412, 575 P.2d at 102, must be compensated for by providing an equal or greater benefit.

■ 55. Property rights are also protected under the due process and equal protection clauses. *See* N.M. Const. art. II, § 18; U.S. Const. amend. XIV, § 1. Before the legislature may substantially alter the level of retirement benefits, it must provide employees and retirees with adequate notice and an opportunity to respond. *See Reid v. New Mexico Bd. of Examiners,* 92 N.M. 414, 415–16, 589 P.2d 198, 199–200 (1979) (stating that due process requires notice and opportunity to be heard prior to any deprivation of property right). While we find today that newspaper publication is sufficient notice of the legislature's intent to repeal the tax exemption provisions and that open legislative committee meetings provide adequate opportunity to respond, our holding is based on our conclusion that there is no vested right to receive pension benefits free from tax. When the legislature attempts to impair a vested property right, however, the notice and opportunity to respond must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950).

■ 56. We agree with the New Jersey Supreme Court that "[t]he responsibility for creating public contracts is the Legislature's. A commitment of that kind should be so plainly expressed that one cannot doubt the individual legislator understood and intended it." *Spina,* 197 A.2d at 176. Our four retirement plans do not clearly and unambiguously create private contractual rights. We decline to join those states that find a contractual relationship where one does not clearly and unambiguously exist and that proceed to justify how the legislature may nonetheless unilaterally modify this contract without the consent of the participants. The legislature may choose to expressly provide New Mexico state employees with a contractual right to retirement benefits. However, until it does so, we will not read such a right into the statutes.

57. Neither our case law nor the four statutory retirement plans clearly and unambiguously grant private contractual rights to state employees or retirees. Therefore, we

find the tax exemption provisions under consideration likewise do not confer contractual rights. Because we find no contractual rights, we find no impairment or breach of contract resulting from the repeal of the tax exemption provisions in the four retirement plans. Although we find the four retirement plans confer property rights that vest upon accumulating the minimum earned service credits, we find these rights do not include the right to receive pension benefits exempt from tax.

**D**

58. We now address whether Appellants received sufficient due process before the tax exemptions were repealed. Appellants argue that there was insufficient notice and opportunity to be heard. Appellee notes that the legislative committee meetings were open to the general public and that the retirees could attend and testify. Therefore, Appellees argue there was no violation of due process. We agree.

59. Determining what procedural protections are due requires weighing several factors. *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). Our first task is to determine the nature and significance of the private interest. *See Zinermon v. Burch,* 494 U.S. 113, 127, 110 S.Ct. 975, 984, 108 L.Ed.2d 100 (1989). Next, we assess the risk of an erroneous deprivation under the procedures available and what value any additional safeguards would provide. Finally, we examine the competing state interests. *Id.* In other words, "[h]aving identified the property interest, we must determine what process is due it." *New Mexico Indus. Energy Consumers v. New Mexico Pub. Serv. Comm'n,* 104 N.M. 565, 567, 725 P.2d 244, 246 (1986). Due process is "an embodiment of fundamental ideas of fair play and justice." *Erwin v. City of Santa Fe,* 115 N.M. 596, 599, 855 P.2d 1060, 1063 (Ct.App.1993).

60. Notice of the legislative intent to repeal the tax exemptions was publicized in the local newspapers. The committee meetings discussing the repeal were open to the general public. However, the private interests under consideration are statutorily granted tax exemptions on retirement benefits. The four retirement plans provide no contractual or vested rights to receive irrevocable tax exemptions. Therefore, where there is no constitutionally protected private interest in the tax exemptions, we find no due process violation. *See Zinermon,* 494 U.S. at 127, 110 S.Ct. at 984.

**IV**

61. Appellants also assert that the court erred in admitting Appellee's Exhibit B consisting of Taxation and Revenue Secretary Dick Minzner's affidavit and five newspaper articles. We defer to the trial court when determining what evidence may be admitted and will reverse only upon finding an abuse of discretion. We will find an abuse of discretion when the "court's decision is clearly untenable or contrary to logic and reason." *Newsome v. Farer,* 103 N.M. 415, 420, 708 P.2d 327, 332 (1985). Appellants contend that the newspaper articles were inadmissible hearsay and not appropriate exhibits to a motion for summary judgment. Further, they argue that Minzner's affidavit constituted an after-the-fact statement about the legislative history of Senate Bill 310. *See Whitely v. New Mexico State Personnel Bd.,* 115 N.M. at 313–14, 850 P.2d at 1016–17 (holding that statements by individual legislator made after enactment not admissible to show legislative intent). We might agree with Appellants had the exhibit been introduced solely to prove legislative intent.

62. However, as discussed above, an important question before the court was whether the constitutional requirements of due process had been met. Minzner's affidavit presented the chronology of events as evidence that notice of the committee meetings had been given and that the press accurately reported the activities of the committee meetings. Notwithstanding dicta in *State ex rel. Helman v. Gallegos,* 117 N.M. 346, 355–56, 871 P.2d 1352, 1361–62 (1994) (contemporaneous documents actually submitted to legislature may be admitted to show legislative intent where statutory meaning unclear), we have consistently held that it is inappropriate to introduce subsequent affidavits solely for

**230**

the purpose of showing legislative intent. However, Minzner's affidavit was not introduced solely to show legislative intent, and it was limited to personal knowledge. *Cf. Whitely v. New Mexico State Personnel Bd.*, 115 N.M. at 314, 850 P.2d at 1017 (statement inadmissible because it was not based on personal knowledge). The attached newspaper articles were relevant to show that Senate Bill 310 was adequately publicized. We find no error in admitting the affidavit and newspaper articles for the limited purpose of proving that adequate notice of the contents of Senate Bill 310 was given to meet the constitutional requirements for due process.

**V**

■ 63. We next consider Appellants' argument that the title to Senate Bill 310, 1990 N.M.Laws, ch. 49, was constitutionally defective in failing to state the true and full title to the bill.[15] The title to Senate Bill 310 reads: "An Act Relating to Taxation; Changing Certain Provisions of the Income Tax Act and the Corporate Income and Franchise Tax Act; Amending and Repealing Certain Sections of the NMSA 1978." Appellants argue that the title is invalid because it specifically referenced the Income Tax Act and Corporate Income and Franchise Act whereas it also amended PERA, JRA, MRA, and ERA. We disagree.

■ 64. Where there is ambiguity, we indulge every presumption in favor of the validity of a statute. *See United States Brewers Ass'n v. Director, N.M. Dep't of Alcoholic Beverage Control*, 100 N.M. 216, 219, 668 P.2d 1093, 1096 (1983). We do not require "the title to a legislative enactment ... be an index of everything in the act itself" so long as the title "give[s] notice of the subject matter of the legislation." *In re Estate of Welch*, 80 N.M. 448, 449, 457 P.2d 380, 381 (1969). "Likewise, we have held that the fact that an act may amend certain provisions of other statutes by implication, does not in and of itself violate Section 18." *U.S. Brewers Ass'n*, 100 N.M. at 219, 668 P.2d at 1096 (citing N.M. Const. art. IV, § 18

("No law shall be revised or amended, or the provisions thereof extended by reference to its title only; but each section thereof as revised, amended or extended shall be set out in full.")).

■ 65. Appellants' reliance on *State ex rel. Salazar v. Humble Oil & Refining Co.*, 55 N.M. 395, 234 P.2d 339 (1951), and *Bureau of Revenue v. Dale J. Bellamah Corp.*, 82 N.M. 13, 474 P.2d 499 (1970), is misplaced. In *Humble* the Court found that a bill was unconstitutional because its title expressly referenced select excise taxes on natural resources but also included a provision to establish a permanent fund for severance taxes. 55 N.M. at 419, 234 P.2d at 342, 355–56. The Court noted that the title would have been sufficient had it been stated in general terms. *Id.* However, when specific sections were identified, yet a provision outside the scope of the title was included, the bill was invalid and void. *Id.* at 420–21, 234 P.2d at 356. The Court quoted *State v. Miller*, 33 N.M. 200, 203, 263 P. 510, 511 (1927), that "[t]he purposes of the constitutional provisions are to prevent surreptitious 'log-rolling' legislation and to give general notice to all concerned of the character of proposed legislation." *Humble*, 55 N.M. at 419, 234 P.2d at 355. In *Miller* we stated that while constitutional provisions are mandatory, we will liberally construe the provisions so as not to impede the legislature. *Miller*, 33 N.M. at 203, 263 P. at 511. The legislature is the proper body to determine the title of a bill. *Id.* Where there is any doubt as to the "sufficiency of the title, it must be upheld." *Id.* The Court in *Bellamah* likewise found a bill to be invalid based on the fact that the title alerted the reader only to the possibility of imposing a statute of limitations on the collection of taxes on oil and gas businesses under the new Oil and Gas Emergency School Tax Act even though the bill also applied the statute of limitations to the collection of taxes from other sources under the old Emergency School Tax Act. *Bellamah*, 82 N.M. at 15–16, 474 P.2d at 501–02. When the legislature intends to amend a prior act,

15. "The subject of every bill shall be clearly expressed in its title ... but if any subject is embraced in any act which is not expressed in its title, only so much of the act as is not so expressed shall be void." N.M. Const. art. IV, § 16.

"that amendatory act must be germane to the subject matter of the section sought to be amended." *Id.* at 16–17, 474 P.2d at 502–03.

66. The title to Senate Bill 310 on its face encompassed all New Mexico statutes that could be affected by the income tax or the Corporate Income and Franchise Act. Thus, this title placed on notice anyone potentially liable for income taxes. It is clear that the four retirement programs were modified only as to income tax related provisions. The "amendatory act" was "germane" to the income tax exemptions contained in the four retirement plans. *Bellamah*, 82 N.M. at 17, 474 P.2d at 503. There was no "fraud or surprise by means of concealed or hidden provisions in [the] act which the title fail[ed] to express." *Ballew v. Denson*, 63 N.M. 370, 372, 320 P.2d 382, 383 (1958). Indulging all presumptions in favor of the validity of the legislative act, we find the title sufficiently related to the contents of the bill to pass muster on constitutional grounds.

## VI

67. Finally, we address whether the court erred by awarding Appellee its costs, specifically as to the two affidavits submitted in support of the motion for summary judgment. Appellants question the award of costs because the two witnesses merely submitted affidavits, the affidavits did not contain sufficient information to qualify them as experts, and Appellants did not have an opportunity to cross-examine them concerning their qualifications or findings. Furthermore, Appellants argue that the costs included fees for clerical staff, contrary to the requirements of NMSA 1978, Section 38–6–4 (Repl.Pamp.1987). In *Jimenez v. Foundation Reserve Ins. Co.*, 107 N.M. 322, 327, 757 P.2d 792, 797 (1988), we required that a witness qualify as an expert and testify either at trial or by deposition in order to support an award of expert witness fees. We based our decision on the fact that the "right of a prevailing party to recover costs incurred in litigation is by virtue of statutory authority, or by rule of the court as authorized by statute." *Id.*

68. Appellee argues that while costs may be limited under Section 38–6–4, no such

limitation applies under SCRA 1986, 1–054(E) (Repl.Pamp.1992). We disagree. Although we have imposed no limitations on the discretion of a court to award costs under SCRA 1–054(E), we have cautioned district courts to "exercise this discretion sparingly when considering expenses not specifically authorized by statute and precedent." *Dunleavy v. Miller*, 116 N.M. 353, 363, 862 P.2d 1212, 1222 (1991).

69. This Court has not had the opportunity to address whether the expense of preparing affidavits in support of a summary judgment may be included in an award of costs. An award of costs for the preparation of an affidavit, including costs for clerical support, is not authorized by statute or precedent. The expenses associated with preparing an affidavit for summary judgment are preliminary expenses not directly associated with trial. Under the circumstances of this case, we find the trial court abused its discretion in awarding costs to Appellee for preparation of the affidavits. Therefore, we reverse and remand to the trial court to enter judgment disallowing such costs.

## VII

70. In conclusion, we find that the four statutory retirement programs do not grant Appellants private contractual rights. The four retirement programs create a property interest in individual contributions to the retirement programs and to the funds in the retirement programs. Upon acquiring the minimum number of service credits, state employees have vested but unmatured property rights in retirement benefits. These vested rights did not include the repealed tax exemptions. Based on our finding of no contractual right to retirement benefits, we find no contractual right to the repealed tax exemptions. Therefore, we find no impairment of contract under either the New Mexico or Federal Constitution.

71. In addition, we find no constitutional infirmity in the title of Senate Bill 310. We find no abuse of discretion by the court in admitting Minzner's affidavit to which newspaper articles were attached. However, we do find an abuse of discretion in the court's

award of costs to Appellee for the preparation of affidavits used in its motion for summary judgment. We affirm in part and reverse in part.

72. **IT IS SO ORDERED.**

RANSOM, J., and DIANE DAL SANTO, District Judge (Sitting by Designation), concur.